**STATE of Tennessee, Appellee,**

v.

**Rubert BROWNING, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Nov. 25, 1983.

Permission to Appeal Denied
Jan. 30, 1984.

Charles R. Ray, Nashville, for appellant.

William M. Leech, Jr., Atty. Gen., Jerry L. Smith, Asst. Atty. Gen., Nashville, Lawrence Ray Whitley, Dist. Atty. Gen., Springfield, for appellee.

## OPINION

DUNCAN, Judge.

The defendant, Rubert Browning, was convicted of murder in the first degree and received a life sentence in the penitentiary.

The defendant contests the evidence, contends his statements to the police should have been suppressed, maintains other evidence should not have been admitted, claims that one witness's testimony contained an unfavorable racial comment, raises a venue question, and insists that the district attorney general's office should have been disqualified from prosecuting the case. We find no merit to any of these issues.

This defendant, who was seventy-eight (78) years old at the time of this crime, was convicted of murdering his seventy-six (76) year old wife, Cecile Browning. At the time of the victim's death, she and the defendant had been married for over fifty-seven (57) years. The State presented ten (10) witnesses in establishing its case. The defendant neither testified nor presented any witnesses.

The State's evidence showed that on May 10, 1982, shortly after 3:00 a.m., the Springfield Police Department received a telephone call about an alleged suicide at 110 Kinney Road in Springfield. Officers were dispatched to the scene, and when they arrived they found Mrs. Browning's body in a hall near the bathroom. The officers found that the defendant was the only other person in the house. The victim's body was clad in pajamas and underneath the right side and back of her head

was a large amount of blood. A small revolver was on the floor in the bathroom. The gun contained two (2) spent cartridges and four (4) live rounds. The victim had several bruises and marks on her throat, a black eye, and had sustained bullet wounds to the right side of her head. There were no signs of a forced entry into the house. The defendant appeared calm, and he was fully dressed. He told the police that he was awakened by what he thought was a firecracker. He went to the bathroom, forced the door open, and observed his wife on the floor. He pulled her into the hallway where he washed blood from her face. He explained that his arms had been bruised when he forced open the bathroom door.

After the victim was shot and before the police arrived, the defendant telephoned two (2) neighbors, telling them that his wife had shot herself. He also telephoned his daughter to the same effect. Later that morning, when the police requested his consent to an autopsy, he refused, saying he knew how his wife died—that she had shot herself. However, the defendant's daughters, who were present, consented to the autopsy. Subsequently on that day an autopsy was performed, and it showed that the victim's death was the result of homicide, not suicide. The autopsy revealed two (2) bullet wounds to the victim's head, evidence of manual strangulation, and multiple bruises to her shoulder, left eye and hands. Further, several ribs had been fractured. The pathologist stated that the cause of death was "hemorrhage in the brain." He said the strangulation would have been severe enough to cause the victim's death, but he could not say whether the bullet wounds or the strangulation occurred first.

A few days after the homicide, the defendant told Carney Bush that he thought a black man had come in the house and killed the victim because there were some things missing out of the house. On another occasion, the defendant voiced to his daughter his opinion that a black man might have been responsible for the victim's death. Also, at another time, he became upset at his daughter for offering a reward for information about her mother's death, and he told her that "[t]his is one thing that will never get out ... you better back out of this and back down off of this now before someone else gets hurt as bad or worse."

In different interviews with the police, the defendant made some conflicting statements, but emphatically denied that he had killed his wife. He stayed with his denials until May 25, 1982. On that date he voluntarily came to the police station to attempt to get his pistol, and after a lengthy interview, he finally told the police he would tell them the true facts. He said his wife had been contrary with him for a month, and that on the night in question, his wife received a phone call about 3:00 a.m., which call she took in the hall. When she returned to the bedroom, she was mad and had a gun. She jerked the covers off of him, they wrestled, and she hit him with the gun. He said that as they wrestled, he grabbed the gun, and that he might have hit her in the head. He told the police that they went to the bathroom, and that as they continued to wrestle, the gun went off, his wife fell, he grabbed the gun, and he shot her, intending to kill her because she was trying to kill him.

After his admission, the defendant called his daughter and told her he had admitted killing Mrs. Browning. Additional evidence showed that on July 21, several months after the homicide, the defendant's daughter was at the Browning home cleaning and packing up. Her father was in jail at this time, he having been formally charged and incarcerated on May 25. Between the mattress and headboard of her mother's bed she found a bandage that her mother had been wearing for a head wound she had received in an incident that had occurred on May 4, 1982. A handful of hair was in the bandage. Later, the daughter found a bullet in the Browning's washing machine. Since the killing, the only things washed in the machine, to the daughter's knowledge, were the bed clothes from her mother's bed.

The May 4, 1982, incident referred to above, when Mrs. Browning received a head wound, will be mentioned later in connection with another complaint. We need only comment here that evidence about that incident was introduced by the State to support its theory that the defendant had also assaulted his wife on that occasion just a few days before he killed her.

Other evidence was introduced to show that at times leading up to the date of the homicide, the defendant had been keeping company with two (2) local women and had paid them considerable sums of money for sexual favors, consisting of fondling parts of their bodies. Testimony relating to conversations between these women and the defendant was presented to the jury.

To sustain a verdict of murder in the first degree, the evidence must establish that the killing was willful, deliberate, malicious, and premeditated. T.C.A. § 39–2–202 (1982); *Everett v. State*, 528 S.W.2d 25 (Tenn.1975).

■ Regarding the element of malice, the use of the deadly weapon by the defendant in the killing of the victim supplied the necessary element of malice. *Everett v. State, supra.* Whether malice is present in a case is a jury question. *Cagle v. State*, 507 S.W.2d 121 (Tenn.Cr.App.1973). Additionally, aside from the use of the deadly weapon, there was considerable other evidence to show that the killing was done maliciously.

■ Further, the elements of premeditation and deliberation are jury questions and may be inferred from the manner and circumstances of the killing. *Cagle v. State, supra.* There is no required amount of time that must elapse between the formation of the intention to kill and the actual killing so as to establish premeditation. *Cagle v. State, supra.* Also, the defendant's calmness after the killing was a factor from which the jury could infer premeditation. *Sneed v. State*, 546 S.W.2d 254 (Tenn.Cr.App.1976).

■ Unquestionably, the evidence, as we have summarized, fully authorized the jury to find that the State had proven beyond a reasonable doubt all of the elements required for a first degree murder conviction. The evidence is more than sufficient to support the jury's verdict finding the defendant guilty beyond a reasonable doubt. *T.R.A.P.* 13(e); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Next, the defendant contends that the trial court erred in overruling his motion to suppress his statements to the police. This motion concerned statements made by the defendant on May 10, 1982, May 15, 1982, and two statements made on May 25, 1982.

■ The statement made by the defendant on May 10, 1982, was made to the police while they were conducting the initial investigation on the scene. The defendant was not in custody. In fact, he was not actually arrested and charged until after his May 25 statements. The May 10 statement was properly admitted.

The statements made by the defendant on May 15, 1982, and May 25, 1982, were made by the defendant after he voluntarily appeared at the police department. The defendant argues that those statements should have been suppressed, insisting that the defendant was being unlawfully detained at the time.

Detective Dave Benton, who interviewed the defendant, indicated that at the time the defendant gave the May 15 and 25 statements he had not yet arrested the defendant because he felt the police did not have probable cause to formally charge the defendant. Detective Benton also said that even though the defendant had voluntarily come to the police department and had not yet been arrested, still he would not have allowed him to leave while they were interviewing him. However, the record shows that the defendant was neither aware that he could not leave, nor did he indicate in any manner that he wanted to leave.

The State argues that the defendant's detention was not a "seizure" within the

meaning of the Fourth Amendment, relying on *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), which case held that a "seizure" occurs when in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. The State argues that under the facts of the present case, the defendant could not reasonably believe that he was not free to leave during the times he was being interviewed by the police. The defendant argues that the facts in the present case are more like the facts in *Florida v. Royer*, —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where the United States Supreme Court found an illegal seizure occurred when Royer was not told that he did not have to submit to interrogation and that he was free to leave. The State disagrees and says that the United States Supreme Court did not depart from the *Mendenhall* test in *Royer*, and that *Royer* is distinguishable from *Mendenhall* on its facts, and further argues that the present case is also factually distinguishable from *Royer*.

For the reasons discussed hereafter, we do not deem it necessary to consider the holdings in either *Mendenhall* or *Royer* in our decision in the present case because in our opinion the police had probable cause to arrest or detain the defendant on both May 15 and May 25.

█ The fact that the police did not subjectively believe they had probable cause to arrest the defendant until after he implicated himself in his final statement given on May 25 is of no significance. The controlling issue in matters of this kind is not whether an officer subjectively thinks he has probable cause, but rather whether the facts and circumstances within the officer's knowledge at the time of the arrest (or detention) actually constitute probable cause. *Wadley v. State*, 634 S.W.2d 658 (Tenn.Cr.App.1982); *State v. Duer*, 616 S.W.2d 614 (Tenn.Cr.App.1981).

█ When the above test is applied to the present case, we find that the officers had probable cause to arrest or detain the defendant at any time after May 10, 1982. On that date the defendant was the only person who was present in the house when the deceased's body was found. The police were in immediate possession of the knowledge that the defendant had stated to two (2) of his neighbors and his daughter that the victim had shot herself, and later that day when the defendant's consent to an autopsy was requested, he indicated the same thing to the police. Further, that same day, the police learned from the autopsy report that the victim's death was a homicide and not a suicide, thus indicating to the police that the defendant had fabricated the suicide theory. These facts in the knowledge of the police were more than sufficient to constitute probable cause for the arrest or detention of the defendant. The fact that the police waited until May 25 to formally arrest and charge the defendant is immaterial because a defendant has no constitutional right to be arrested at any particular time. *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

█ Further, we do not see that there was any unnecessary delay in taking the defendant before a magistrate as required by *Tenn.R.Crim.P.* 5. After the interview of May 15, the defendant was released without charge, and after the completion of the interviews on May 25, he was immediately taken before the magistrate where he was formally charged with the murder of his wife.

█ We find that the facts and circumstances of this case do not show any illegal detention of the defendant at the time he gave his statements. The trial court properly overruled the defendant's motion to suppress his statements.

█ Another complaint by the defendant is that the trial court erroneously admitted evidence of an assault upon the victim that occurred on May 4, 1982. The jury was entitled to find from the evidence that on that date the defendant assaulted the victim, causing her to suffer a severe head wound. This incident, which occurred

only six (6) days before the homicide, was probative on the issues of premeditation and intent to kill, and to rebut the insinuations of suicide. Evidence of other crimes is admissible if probative of an issue in dispute in the case on trial. *Bunch v. State,* 605 S.W.2d 227 (Tenn.1980); *McGowan v. State,* 221 Tenn. 442, 427 S.W.2d 555 (1968); *State v. Turnbill,* 640 S.W.2d 40 (Tenn.Cr.App.1982). The evidence was properly admitted.

■ Also, the defendant complains of the use of the term "nigger" by the witness Sarah Douglas, in her testimony relating what the defendant told her about the May 4 assault on the victim. Ms. Douglas testified that the defendant told her some "nigger" hit his wife in the head. Ms. Douglas was merely repeating the word used by the defendant, not by her. There is no merit to this complaint.

■ Equally without merit is the defendant's complaint about the testimony of the deceased's daughter, who testified that on the morning of her mother's death, she observed that the kitchen table was set for breakfast. It was shown to be the victim's customary routine to set the table for breakfast the night before. This evidence was proper to show that the victim's state of mind was progressing normally prior to the killing. It is highly unlikely that a person contemplating suicide during the night would bother to make preparations for the next morning's breakfast.

■ Further, we find that the trial court properly admitted three (3) photographs into evidence. These photographs were of the victim's body and showed her numerous bruises. The photographs were not particularly gruesome. They were probative to show that the victim's death was not caused by suicide. Also, they were relevant to show the severity of the beating that the victim received. The trial court properly found that their probative value outweighed their prejudicial effect. The trial court properly exercised its discretion here. *State v. Banks,* 564 S.W.2d 947 (Tenn.1978).

Next, the defendant argues that the trial court erred in denying his motion for a change of venue.

■ The decision of whether to change the venue is for the sound discretion of the trial judge, and he will not be reversed on appeal absent a clear abuse of such discretion. *State v. Melson,* 638 S.W.2d 342 (Tenn.1982).

■ The defendant attempted to support his motion by attaching thereto numerous affidavits from local citizens. In substance, these affiants said they did not believe the defendant could receive a fair trial due to the unusual amount of publicity attendant to the case and due to strong feelings in the community. The affidavits stated mere conclusions. Conclusory affidavits, standing alone, which state that because of extensive publicity a defendant cannot receive a fair trial will not suffice to show an abuse of discretion in denying a change of venue. *Melson, supra,* at 360. Further, in order to obtain a reversal because of a denial of a change of venue, it must be shown that the jury which actually sat on the case was biased and prejudiced. *Melson, supra,* at 360–61.

■ We find nothing in the instant record to show that the jurors who heard the defendant's case were biased or prejudiced in any respect. The voir dire is not included in the record and thus, we must presume that there were no problems in selecting a fair jury to try the case.

We find this issue to be without merit.

Finally, the defendant says the trial court should have required the district attorney general's office to disqualify itself from prosecuting the case because Assistant District Attorney General Dee Gay was a prospective witness. The defendant cites DR 5–101 and 5–102 of Tennessee Supreme Court Rule 8 governing the withdrawal of attorneys who may become witnesses in a case they are handling.

■ General Gay had sat in on one of the police interviews with the defendant, but the State did not propose to call him as

a witness. Rather, the State relied on the testimony of Detective Benton, concerning the defendant's statements. The defendant called General Gay at the suppression hearing. General Gay only gave his recollection of the advice he gave Detective Benton and about the events that surrounded the taking of the defendant's statements.

 Where a lawyer is employed by a party in a case, and is called as a witness by the other party, he is under no obligation to withdraw until "it is apparent that his testimony is or may be prejudicial to his client." *Sup.Ct. Rule* 8 (DR 5–102(B)).

Obviously, General Gay's testimony was not prejudicial to the interests of the State, his client in this case. This issue is without merit.

We find no reversible error in this record. The judgment is affirmed.

O'BRIEN and DAUGHTREY, JJ., concur.