STATE of Tennessee, Appellee,

v.

Joe T. BAKER, Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

March 22, 1996.

Permission to Appeal Denied by Supreme Court Sept. 16, 1996.

Wade Bobo, Clarksville, James A. Simmons, Nashville, for Appellant.

Charles W. Burson, Attorney General and Reporter, Nashville, Michael E. Moore, Solicitor General, Michael W. Catalano, Associate Solicitor General, Nashville, Steve Garrett, Assistant District Attorney, Clarksville, for Appellee.

## OPINION

WADE, Judge.

The defendant, Joe T. Baker, appeals of right from his conviction for felony murder. The state had unsuccessfully sought the death penalty. The trial court imposed a life sentence.

The defendant presents the following issues for our review:

(1) whether the trial court erred by refusing to suppress statements obtained from the defendant after the appointment of counsel;

(2) whether the trial court erred by refusing to disqualify the district attorney general's office from the prosecution; and

(3) whether any violation of the Code of Professional Responsibility would warrant a new trial.

We affirm the conviction.

On January 8, 1989, the defendant, Roosevelt Bigbee (defendant's brother-in-law), and Joel Hoosier robbed Beach's Market and shot and killed the victim, Vada Langston, the clerk on duty. Initially, the defendant denied any involvement and told Clarksville police that Hoosier was responsible for the crime. The defendant claimed that Hoosier had given him the murder weapon which he then turned over to the

authorities. The defendant agreed to "wear a wire" and brought police officers a tape recording which purportedly contained Hoosier's confession. The recording was actually a fake that the defendant had made with the help of Bigbee. Afterwards, police charged Hoosier with the robbery and murder.

Just before Hoosier's preliminary hearing, Bigbee admitted to Detective J. Runyon and Steve Garrett, an assistant district attorney, that he had been involved in the crime. He claimed that he had helped Hoosier plan the robbery but decided not to participate when Hoosier declared that he would kill the clerk. The assistant district attorney suspected that the defendant and Bigbee "weren't telling all that they knew" and asked officers to further investigate. Later, Detective Runyon interviewed Bigbee, but not the defendant. Meanwhile, the assistant district attorney continued to monitor the progress of the police investigation.

A few days later, the defendant, claiming that he had some important information, called Detective Charles Denton and asked that he come to his apartment. In the ensuing meeting, the defendant told Detective Denton and Detective Runyon that Bigbee "might" have been fully involved in the robbery and murder. The defendant claimed that he felt threatened by Bigbee and his brother, who had called him a snitch. Later that evening, the defendant and Bigbee returned to the police station for additional questioning. The defendant admitted that the tape he had given the police was a fake. He claimed that Bigbee, rather than Hoosier, had given him the murder weapon. The police arrested Bigbee and confronted him with the defendant's accusation. Bigbee responded that the defendant "wasn't the man [police] thought and that [Bigbee] wasn't going down alone." When Detective Denton and Detective Runyon informed the district attorney general of the remark, the defendant was placed under arrest.

Assistant District Attorney Garrett did not directly participate in the interrogation but did overhear some of the answers given by Bigbee and the defendant. Also, he submitted several written questions to the investigating officers for the defendant to answer. Later the officers provided him with the defendant's replies.

A day after his arrest, the defendant contacted Detective Runyon, telling him he had more information and asking that he visit. Detective Runyon and Detective Denton then took the defendant out of jail and returned him to the police station. At that point, the defendant claimed that he had originally planned to participate in the robbery but, upon learning that Hoosier and Bigbee planned to kill the clerk, told them he wanted no part of it and got out of the car. The defendant also informed the police that he had knowledge of several other crimes, hoping that his additional "cooperation" might warrant some leniency.

Shortly thereafter, the defendant was appointed defense counsel, who advised him to make no further statements. Nevertheless, the defendant made three or four collect calls to the district attorney's office, offering to provide additional information in exchange for "a deal." On each occasion, the assistant district attorney advised the defendant to contact his counsel.

The defendant also made a series of telephone calls to Detective Denton and Detective Runyon seeking further discussions. The officers then conferred with Assistant District Attorney Garrett about the propriety of taking any further statements absent the presence of defense counsel. After researching the issue, the assistant district attorney advised that by initiating the contact, the defendant had probably made a valid waiver of the right to counsel, unless defense counsel had left specific instructions not to talk to the defendant. Apparently, defense counsel had not done so.

Several days later, the defendant sent Detective Denton and Detective Runyon a letter acknowledging his desire to make a statement despite the fact that he had counsel. He then admitted that he had actually been inside the store during the robbery but was unaware that Hoosier and Bigbee had planned to rob the store or kill the clerk. The defendant identified Bigbee as the "trigger man." Upon receiving this information, Detective Denton and Detective Runyon de-

cided to again talk to the defendant in person. The defendant confirmed the accuracy of the content of the letter.

During the trial proceedings, Assistant District Attorney Garrett acknowledged that he did not inform defense counsel of this last interview. He did, however, state that he had previously told defense counsel that his client "was calling everybody ... trying to talk." Defense counsel recalled the conversation with the assistant district attorney and conceded that he had not left specific instructions that there be no discussions with the defendant outside of his presence. He explained that he had assumed that he would be notified of any possible meetings with the defendant in accordance with the customary practice of the district attorney general's office.

The defendant also telephoned Montgomery County District Attorney General Patrick H. McCutchen asking that he come to the jail. Identifying himself as "Mr. Miller," the defendant claimed to have information on a Robertson County double murder, which he wanted to give in exchange for a lower bail. District Attorney McCutchen suspected that the defendant had called and, upon arriving at the jail, confirmed his suspicions. The defendant immediately asked what kind of "deal" he could get in exchange for his information. The district attorney refused to offer any deal until the defendant told what he knew. The defendant declined.

In a later statement, the defendant claimed that Christopher Walker, a member of the Marine Corps, had also participated in this crime. Naval Criminal Investigative Service Agent James D. Campbell took the statement in the presence of defense counsel, but refused to offer leniency to the defendant in exchange for the information. Afterward, the defendant retracted his accusation.

Bigbee and the defendant were also suspected of other crimes. Even before Bigbee and the defendant were suspects on these charges, officers had asked General McCutchen to participate in a meeting with the two men. Officers believed that Bigbee had been involved in a series of car thefts; the defendant, claiming to be a concerned "father figure," asserted that he had some information about the Beach's Market robbery and murder. He told the officers that he believed he could deliver the murder weapon to them, but wanted to make sure his cooperation would help Bigbee.

Some of the other crimes under investigation occurred outside Montgomery County. In early March, several police officers and district attorneys from Montgomery, Dickson, and Sumner Counties met to discuss the nature of the various crimes and the physical evidence that each had obtained. Detective Donald Linzy and Sergeant Paul Harbsmeier of the Hendersonville Police Department interviewed the defendant about the other crimes in their county and Detective Linzy testified that the defendant never mentioned his involvement in the Montgomery County robbery. During two of the interviews, the defendant attempted to make "a deal" with Sumner County authorities in exchange for the information he possessed; they refused.

At some point in the investigation of the other crimes, the Sumner County officers obtained letters which the defendant had written to Bigbee while both were in jail. During the time that Detective Linzy and Sergeant Harbsmeier were gathering information, the defendant contacted another local attorney and expressed a desire to employ him. Although he already had appointed counsel, the defendant claimed that he had been unable to effectively communicate with his attorney and had been made several promises by various law enforcement officials which had not been kept. When the defendant was unable to obtain the funds necessary to hire the second attorney, the trial court appointed him as co-counsel.

I

◼ After a careful consideration of the defendant's claim that the statements made to police after the appointment of counsel should have been suppressed, we conclude otherwise. There are several reasons: first, the defendant was given his *Miranda* rights before each statement, *see Owens v. State,* 561 S.W.2d 167, 169 (Tenn.Crim.App.1978) (the defendant, who was given his *Miranda* rights, voluntarily waived right to counsel

where he sent for police, even though police did not contact defense counsel prior to statement); second, the defendant clearly initiated each contact, *see State v. Claybrook,* 736 S.W.2d 95, 102–03 (Tenn.1987) and *State v. Zagorski,* 701 S.W.2d 808, 812 (Tenn.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986); and third, defense counsel conceded during the suppression hearing that he had never instructed law enforcement officials not to talk to his client outside his presence. *See State v. Berry,* 592 S.W.2d 553, 561 (Tenn.), *cert. denied,* 449 U.S. 887, 101 S.Ct. 241, 66 L.Ed.2d 112 (1980) (holding that statements made to a jail informant, although voluntary, were inadmissible as a violation of defendant's sixth amendment right, in part, because defendant's attorney had specifically instructed officers not to question his client outside his presence). *But see McPherson v. State,* 562 S.W.2d 210, 212–13 (Tenn.Crim.App.1977) (finding waiver of right to counsel even where defense counsel had instructed authorities to take no statements from his client without his presence, where statement taken in presence of neutral third party corroborated the waiver). Finally, a trial court's determinations of fact at a suppression hearing are presumed correct. *See State v. Harbison,* 704 S.W.2d 314, 318 (Tenn.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986). Here, the trial court ruled that the defendant had knowingly and voluntarily waived his right to counsel by initiating the conversations.

■ The defendant also makes the argument that the police elicited his incriminating statements by insinuating that he would receive lenient treatment in return. The law provides, of course, that confessions obtained through the use of either physical or psychological coercion must be suppressed. *See Rogers v. Richmond,* 365 U.S. 534, 540–41, 81 S.Ct. 735, 739–40, 5 L.Ed.2d 760 (1961). A statement will not be rendered involuntary, however, when officers have, without more, promised general assistance. *See State v. Johnson,* 765 S.W.2d 780, 782 (Tenn.Crim. App.1988). In order to render the statement involuntary, the defendant must have been "gripped by the hope of leniency, and, as a result, was not able to choose freely and rationally among the courses available to

him." *State v. Grady E. Shoffner,* No. 03C01–9403–CR–00113, slip op. at 6, 1995 WL 382628 (Tenn.Crim.App., at Knoxville, June 27, 1995) (citing *State v. Kelly,* 603 S.W.2d 726 (Tenn.1980)). The offer of leniency must be clearly understood to be a guarantee and the defendant's will to resist must have been critically impaired. *Id.* In *Shoffner,* this court identified four factors critical to the determination: (1) the length of time between the arrest and confession; (2) any intervening events between arrest and confession; (3) the provision of *Miranda* warnings; and (4) the purpose and flagrancy of official misconduct. *Id.*

■ There is no question that the defendant was told early on that any information he gave would benefit his brother-in-law, Roosevelt Bigbee. At that time, however, the defendant was looked upon as a well-meaning citizen and concerned relative, not a suspect in the crime. During this period, the defendant had made no incriminating statements. On January 28, 1989, shortly after his arrest but before the appointment of defense counsel, Detective Denton told the defendant that his "cooperation would go a long way ... [to] help yourself." Not long thereafter, Sergeant Harbsmeier and Detective Linzy, both of the Hendersonville Police Department, informed the defendant that they would discuss his willingness to assist with the district attorney. While informing the defendant that they could not make any promises, they did say that they thought his assistance might help "quite a bit." Yet the defendant made no incriminating statements about the robbery and murder during this interview. Moreover, when the district attorney demanded the information offered by the defendant before considering any "deal," the defendant refused to cooperate. From all of this, we conclude that any promise of benefit was of a general nature and did not overcome his "free and rational" choice.

■ The defendant's final challenge to the admissibility of his statements rests upon his claim that the state violated Formal Ethics Opinion 87–F–112:

Disciplinary Rule 7–104(A)(1) of the Code of Professional Responsibility em-

bodied in Tennessee Supreme Court Rule 8 prohibits a lawyer from communicating with one of adverse interest known to be represented by a lawyer in the matter without the prior consent of the lawyer representing the adverse party.

\*　　\*　　\*　　\*　　\*　　\*

The prohibition is intended to preserve the integrity of the client-lawyer relationship by protecting the represented party from the superior knowledge and skill of the opposing lawyer. *See Powell v. Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158] (1932); *United States v. Thomas,* 474 F.2d 110 (10th Cir.), *cert. denied,* 412 U.S. 932 [93 S.Ct. 2758, 37 L.Ed.2d 160] (1973); *State v. Yatman,* 320 So.2d 401 (Fla.Dist. Ct.App.1975); *Tennessee Bar Association v. Freemon,* 50 Tenn.App. 567, 362 S.W.2d 828 (1961).

A prosecutor may not circumvent the prohibition through the use of a law enforcement official or by advising another to communicate in a manner which would be impermissible if engaged in by the prosecutor. *See People v. Hobson,* 39 N.Y.2d 479, 348 N.E.2d 894, 384 N.Y.S.2d 419 (1976); *Schantz v. Eyman,* 418 F.2d 11 ( [9th Cir.] 1969), *cert. denied,* 397 U.S. 1021 [90 S.Ct. 1259, 25 L.Ed.2d 530] (1970).

The prohibition applies even though the defendant has requested the interview, *e.g., People v. Green,* 405 Mich. 273, 274 N.W.2d 448 (1979); *State v. Britton,* 157 W.Va. 711, 203 S.E.2d 462 (1974), or where the interview is in connection with the investigation of other criminal activity, *e.g., In Re Burrows,* 291 Or. 135, 629 P.2d 820 (1981).

ABA Informal Opinion 1373 (Dec. 2, 1976) held that a prosecutor violated DR 7–104(A)(1) by forwarding to the defendant copies of letters to defense counsel containing plea bargain offers.

A state prosecutor is ethically obliged to avoid any and all communications with defendants without the knowledge and consent of the defendant's attorney.

A violation of the disciplinary rules, however, is not necessarily a valid basis for suppression of evidence. In *State v. Mosher,* 755 S.W.2d 464, 469 (Tenn.Crim.App.1988), the court ruled as follows:

Disciplinary Rule 7.104(A)(1) of the Code of Professional Responsibility is incorporated into Rule 8 of the Tennessee Rules of the Supreme Court. That prohibition against communication absent the consent of adverse counsel has been found to apply in criminal cases. *U.S. v. Springer,* 460 F.2d 1344, 1354 (7th Cir.1971), *cert. denied,* 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972). Some courts have found the rule applicable to non-lawyer law enforcement officers acting on behalf of prosecutors under an alter-ego theory. *U.S. v. Thomas,* 474 F.2d 110, 112 (10th Cir.1973), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973). None of the courts recognizing these principles, however, have excluded the evidence acquired pursuant to the prohibited communication.

In *United States v. Vasquez,* 675 F.2d 16, 17 (2nd Cir.1982), the defendant sought to suppress a tape recording of his conversation with an informant made after the employment of defense counsel:

Such a principle would simply enable criminal suspects, by retaining counsel, to hamper the government's conduct of legitimate investigations. Even assuming this provision of the Code to be applicable to a criminal investigation, which is doubtful, it was not intended to lead to such a result.

In our view, the ruling in *Mosher* controls on this issue. Any violation of the code would not result in the suppression of the evidence.

### II and III

The defendant's second and third issues address whether the district attorney general and his staff should have been disqualified from prosecuting these charges. The defendant asserts that DR 5–101(B) and 5–102 and the "unsworn witness rule" precluded the participation of the District Attorney General of Montgomery County.

The focus on whether a district attorney or any assistants within the office should be disqualified often depends upon the value of their potential testimony. In *Bowman v. State,* 598 S.W.2d 809, 811 (Tenn.Crim.App. 1980), for example, this court held that it was

not error to allow the rebuttal testimony of a prosecuting attorney because it was not foreseeable before trial that his testimony would be needed. The court pointed out that there were two prosecutors and that the one who testified participated in a limited fashion after the need for his rebuttal testimony became apparent. *See also State v. Mona Lisa Watson,* No. 24, 1991 WL 153017 (Tenn. Crim.App., at Jackson, August 14, 1991), *perm. to appeal denied,* (Tenn.1992) (assistant district attorney listed on witness list not disqualified after explaining that he had merely presented the case to the grand jury, would not be called at trial, and actually did not testify).

Generally, a district attorney should not participate in the prosecution when it appears that he or she will be called as a witness at trial. DR 5–101(b) and 5–102. Here, the defendant gave the assistant district attorney who prosecuted the charges · notice in advance of trial that he would be called as a witness.

In *State v. Browning,* 666 S.W.2d 80, 86–87 (Tenn.Crim.App.1983), the court ruled that when called as a witness by the other party, the prosecutor was under no obligation to withdraw unless "it is apparent that his testimony is or may be prejudicial to his client." (Quoting Tenn.Sup.Ct.R. 8, DR 5–102(B)). The assistant attorney general in *Browning* . testified only at the suppression hearing and there was no indication that the defendant ever expressed an intent to call the assistant as a witness at trial. The court noted that the attorney's testimony "was not prejudicial to the interests of the State, his client in [the] case." *Id.* at 87.

In *State v. Billy Ernest Kilburn,* No. 2, 1989 WL 89333 (Tenn.Crim.App., at Jackson, August 9, 1989), *perm. to appeal denied,* (Tenn.1989), defense counsel gave an assistant district attorney pretrial notice that he would be called as a witness. The trial court determined that the assistant's testimony would merely be cumulative of others who participated in the investigation of the case, and refused to disqualify on the basis that it would work a hardship on the state. This court affirmed holding that the mere participation of an assistant district attorney in the investigation is no reason to disqualify. *Id.,* slip op. at 7 (citing *State v. Claybrook,* 736 S.W.2d 95 (Tenn.1987) and *State v. Caruthers,* 676 S.W.2d 935 (Tenn.1984)).

█ It is left to the sound discretion of the trial court as to whether to either allow or require a member of the prosecuting team to testify. Because of the potential for misuse of the privileges by the defense, the practice is not to be permitted unless absolutely necessary. *See Bowman v. State,* 598 S.W.2d at 811.

█ Here, the assistant district attorney . was the only witness called by the defense at trial. His testimony is transcribed over forty-five pages within the record. Many of the questions asked by defense counsel dealt with matters that occurred during Bigbee's trial, such as the promises made to Bigbee, and the decisions about what fingerprint evidence would be subjected to analysis. In our view, any one of the several investigating officers could have supplied the answers given for these questions.

The assistant district attorney did, however, answer a few questions about the defendant's telephone calls to the district attorney's office. He was asked if the office maintained records concerning the defendant's waiver of his sixth amendment rights. As to these matters, the assistant district attorney was probably the most likely person to have accurate answers to the questions propounded. These questions were, however, pertinent to the issue of whether the defendant had knowingly and voluntarily waived his right to counsel by seeking to trade information for lenient treatment. Once that issue had been resolved in the suppression hearing, there was little value in the testimony of the witness at trial. Under all of the circumstances, we cannot find that the trial court abused its discretion by refusing to disqualify the office of the district attorney from participating in the case.

Accordingly, the judgment is affirmed.

WELLES, J., and REX H. OGLE, Special Judge, concur.