# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 6, 2007 Session

## STATE OF TENNESSEE v. DEMARIO TABB

**Appeal from the Criminal Court for Shelby County**
**No. 04-03360     Chris Craft, Judge**

---

**No. W2005-02974-CCA-R3-CD  - Filed September 14, 2007**

---

A Shelby County jury found the Appellant, Demario Tabb, guilty of the first degree felony murder of Floricelda Reynoso Ambrocio; the first degree felony murder of the unnamed, viable fetus of Floricelda Ambrocio; and the attempted aggravated robbery of Rodrigo Ramirez.  At the penalty phase of the trial, the jury fixed Tabb's punishment at life without the possibility of parole for each murder conviction.  Following a separate sentencing hearing, the trial court sentenced Tabb to five years imprisonment for his Class C felony conviction for attempted aggravated robbery and ordered that all sentences be served concurrently.  On appeal, Tabb presents the following issues for our review: (1) whether his statement to police should have been suppressed because it was obtained in violation of his constitutional right to counsel; (2) whether the statement was properly admitted as rebuttal proof; and (3) "whether [the trial] court erred in its use of curative instructions to [the] jury." Following review, we find no error and affirm the judgments of conviction.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

M. J. Werner, Memphis, Tennessee, for the Appellant, Demario Tabb.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

Rodrigo Ramirez and his wife, Floricelda Reynoso Ambrocio, relocated to the United States from Guatemala in order to raise their family in safety.  In November 2002, Ramirez, his wife, and their two boys, ages four and six, lived at the Prescott Apartments in Memphis.  At the time, Ambrocio was about seven months pregnant with the couple's third child.  On November 10, 2002,

Ramirez arrived home from work around 10:25 p.m. and, as he walked toward his apartment, he noticed that three black men were following him. After entering his apartment, Ramirez tried to close the door behind him; however, the three men were able to force their way inside. Each of the intruders had a gun. One of the men held a gun to Ramirez's head, demanded "Give me money," and began searching his pockets. Ramirez explained to the man that he had no money. Also in the apartment at the time was Maynor Gonzales, who was Ramirez's cousin. One of the other intruders held a gun to Gonzales while the third man stood close to the door. When the two children started crying, Ambrocio entered the room and attempted to pick them up, but they were too frightened to move. At this point, Ambrocio grabbed a shoe to strike the assailant who was attacking her husband, and one of the other men fatally shot her. The nineteen-year-old victim died before the ambulance could arrive. After the shooting, the three men immediately fled the apartment.

At trial, Ramirez, speaking through an interpreter, positively identified the Appellant as one of the three men who forced their way into his apartment. He testified, however, that he did not know which of the three men shot his wife, but he did not "think" it was the Appellant because he believed that the Appellant "was the one who was attacking [him]."[1]

Several days after the shooting, Ramirez was shown a photographic lineup and identified Anthony Ware as one of the intruders. On November 13, 2002, Ware was taken into custody and informed police that the Appellant was one of the participants in the attempted robbery. He further stated that the Appellant was the person who shot Floricelda Ambrocio.

In May 2004, a Shelby County grand jury returned a three-count indictment charging both the Appellant and Ware with: (1) the first degree felony murder of Ambrocio, committed in the perpetration of an attempted robbery; (2) the first degree felony murder of the unnamed, viable fetus of Ambrocio, committed in the perpetration of an attempted robbery; and (3) criminal attempt to commit aggravated robbery.

At trial, Ware, testifying as a State's witness, stated that he had known the Appellant for about two years. He further testified that, on November 10, 2002, the Appellant asked him for a ride to pick up some money, which Ware assumed someone owed him. The Appellant instructed Ware to go to the Prescott Apartments and, on the way, Ware picked up an acquaintance, known only as Dillon. Upon their arrival, the Appellant instructed Ware to park at the back of the apartment complex and then led the way to the Ramirez apartment. According to Ware, the Appellant knocked on the door and pushed his way inside. Ware and Dillon stood by the door, about four feet from the Appellant. The Appellant went over to one of the men and demanded money. The Appellant pulled out a revolver and held it to the man's head, and their conversation became "aggressive." A woman ran out from the back of the house, and the Appellant shot her. Ware ran out the door, and they met back at his car. Ware testified that Dillon had a black cell phone in his hand and that the Appellant was the only one with a gun. Ware stated that he did not know the Appellant was going to rob the

___

[1] Ramirez initially identified the Appellant on March 10, 2003, from a police photographic lineup as the person who held him at gunpoint.

-2-

man and that he told the Appellant and Dillon "it was messed up." Ware estimated that the shooting took place around 10:00 p.m.

The post-mortem examination established that Ambrocio died from a single gunshot wound, which cut through two chambers of her heart. The examination also revealed that Ambrocio was about seven months pregnant with a baby girl at the time of her murder. The medical examiner opined that the fetus was viable, and, if the mother had received immediate medical attention, the fetus could have been removed and lived outside her mother's body.

In defense, the Appellant called two witnesses, Deandra Wright and LaCurtis Waller. Wright testified that Ware told him that he did not even know the Appellant and, furthermore, didn't know why the Appellant was charged with the crimes at the Ramirez residence. Waller testified that he had known Ware about six years because they were from the same "neighborhood." Waller further testified that around ll:00 or 12:00 p.m., on the evening of November 10, 2002, he was at Rico Hill's residence when Ware and another man, known only as "Big D," dropped by. Waller stated that "Big D" and the Appellant are not the same person. Waller testified that Ware told him that he and Mario Fields, a.k.a. "Tiny," had just "went in [a] house to rob, . . . the man," and when the man's wife came out, she tried to grab Tiny, and Tiny shot her. Waller explained that Ware told him that he had "dropped off" Tiny before arriving at Hill's residence. Waller stated that Ware never mentioned that the Appellant was present during the attempted robbery and shooting.

Waller was later charged with several robberies, and, during one of his court appearances, he encountered Ware in the courtroom where the two talked. Waller said he was housed in the same "pod" with the Appellant and asked about the case. Waller explained that Ware told him that he used to buy marijuana at the Ramirez residence and that he and Fields had decided to rob the man. According to Ware, the man's wife tried to grab Fields, Fields shot her, and they fled. Ware told Waller that he did not know the Appellant but that he "[was] not going to take no time for this [charge]" and, "to dodge this," he was "going to tell them [the Appellant] did it."

In rebuttal, the State called Sergeant Sharon Mabon who testified that she was working in the Homicide Bureau of the Memphis Police Department at the time of the investigation of the Ambrocio homicide. The Appellant contacted her several times while incarcerated and wanted to provide information about the shooting and attempted robbery. On November 23, 2004, at a scheduled meeting at the jail, Mabon interviewed the Appellant.

Mabon testified that the Appellant told her that, on the night of the shooting, he was near the Prescott Apartments and saw Ware's car. According to the Appellant, he had known Ware about four years. On that night, the Appellant wanted to buy some "weed," and Ware offered to drive him to get some. Mario Fields was already in Ware's car, and the three of them went to the Prescott Apartments. The Appellant gave Ware the money for the "weed," and Ware led them to the Ramirez apartment. Ware walked in the house first, followed by Fields, and then the Appellant. Ware pulled out a black automatic and put it to a man's head, and Fields pulled out a revolver and pointed it at the man as well. The female victim tried to help her husband, and Fields shot her. Fields pulled the

phone cord out of the wall, and then they all ran back to the car, at which point Ware told Fields that he should not have shot the lady.

After a five-day jury trial, the Appellant was convicted as indicted. As a result of his convictions for first degree murder, the jury fixed the Appellant's sentences at life in prison without the possibility of parole. Following a separate sentencing hearing, the trial court sentenced the Appellant to five years for criminal attempt to commit aggravated robbery. The trial court ordered all three sentences to run concurrently, resulting in a total effective sentence of one life sentence without the possibility of parole. The Appellant's motion for new trial was denied, and this appeal followed.

**Analysis**

**I.     Motion to Suppress**

The Appellant asserts that the trial court erred in failing to suppress his November 23, 2004 statement to the police because his attorney was not present during the interview and, as such, "his pretrial statement was taken in violation of his U.S. and Tennessee constitutional rights to counsel." Moreover, the Appellant argues that his statement was not voluntarily given because it was extracted under the "hope of leniency." The State asserts the evidence supports the trial court's findings that the Appellant's statement was constitutionally valid because the Appellant initiated contact with the police and made a knowing and voluntary waiver of his constitutional rights.

The findings of fact made by a trial court after an evidentiary hearing on a motion to suppress are afforded the weight of a jury verdict, and an appellate court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against the findings of the trial court. *State v. Odom*, 928 S.W.2d 18, 22 (Tenn. 1996). The trial court, as the trier of fact, is in the best position to assess the credibility of witnesses, to determine the weight and value to be afforded the evidence, and to resolve any conflicts in the evidence. *Id*. at 23. However, this court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of law to the facts found by the trial court is a question of law that this court reviews *de novo. State v. Daniels*, 12 S.W.3d 420, 423 (Tenn. 2000).

It is a firmly established tenet of constitutional law that, after the initiation of formal charges against an accused, the Sixth Amendment right to counsel attaches, guaranteeing the accused the right to rely on counsel as a medium between himself and the state at any critical confrontation with state officials. *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 487 (1985); *State v. Berry*, 592 S.W.2d 553, 557 (Tenn. 1980). In Tennessee, the adversarial judicial process is initiated at the time of the filing of the formal charge, such as the indictment. *State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). Once formal criminal proceedings begin, the Sixth Amendment renders inadmissible, in the prosecution's case-in-chief, statements "deliberately elicited" from a defendant without an express waiver of the right to counsel. *Michigan v. Harvey*, 494 U.S. 344, 348, 110 S. Ct. 1176, 1179 (1990). The waiver of an accused's right to counsel after receiving *Miranda* warnings, or their

equivalent, will generally suffice to establish a knowing and intelligent Sixth Amendment waiver of right to counsel, thus, permitting the introduction of post-arrest statements. *Patterson v. Illinois*, 487 U.S. 285, 292, 108 S. Ct. 2389, 2394-95, n.4 (1988).[2] However, once the accused has invoked his Sixth Amendment right to have counsel present during custodial interrogation, the accused may not be subjected to further interrogation by authorities until counsel has been made available to him, unless the accused himself initiates further communication with the police. *Michigan v. Jackson*, 475 U.S. 625, 636, 106 S. Ct. 1404, 1411 (1986). An accused may waive his Sixth Amendment rights without notifying his attorney. *Owens v. State*, 561 S.W.2d 167, 169 (Tenn. Crim. App. 1977) (citing *Brewer v. Williams*, 430 U.S. 387, 405-06, 97 S. Ct. 1232, 1243 (1977)).

At the hearing on the motion to suppress, the trial court heard testimony from Sgt. Sharon Mabon, the Appellant's appointed trial counsel at the time of the statement, and the Appellant. It is uncontested that the Appellant's Sixth Amendment right to counsel had attached prior to his meeting with Sgt. Mabon.

Sgt. Mabon testified that she worked in the homicide bureau of the Memphis Police Department and that the Appellant had called her several times during his pretrial detention to discuss his pending charges. She explained that it was not the policy of the Memphis Police Department to interview a defendant who was represented by counsel without counsel being present. Mabon testified that she scheduled an interview with the Appellant and his attorney for 10:00 a.m. on November 23, 2004. On this date, the Appellant's trial counsel entered the interview room and talked to the Appellant alone. When trial counsel came out, he informed Mabon that "he did not want to represent [the Appellant] because [the Appellant] wasn't being truthful" and that he was going to withdraw from the case. Trial counsel, however, did not tell Mabon not to interview the Appellant.

After trial counsel left, Sgt. Mabon and Sgt. Oliver entered the interview room. The Appellant told the officers that "he had some conflict with the attorney, and he didn't want [the attorney] to represent him. And that he wanted to go ahead and talk to [them] about his case." Sgt. Mabon advised the Appellant of his constitutional rights, including his right to counsel and his right to remain silent, and, at 11:32 a.m., he signed the waiver of rights form. Sgt. Mabon called trial counsel and left a message on his voicemail that they were ready to go forward with the statement. Later, trial counsel returned her call and said he was going to withdraw from representing the Appellant and that he was not coming back for the interview. Sgt. Mabon testified that no promises

---

[2]Although any review of whether an accused's Sixth Amendment right to counsel was violated may include consideration of his Fifth Amendment right to counsel as guaranteed in *Miranda*, the two have distinct purposes. The right to counsel provided by *Miranda* under the Fifth Amendment protects against coercions that relate to self-incrimination, while the right to counsel under the Sixth Amendment guarantees, after formal charges have been brought, the right to legal assistance at any critical confrontation with state officials, irrespective of coercion. Even though the Fifth Amendment and Sixth Amendment have different functions, we note that the United States Supreme Court, in *Michigan v. Jackson*, 475 U.S. 625, 636, 106 S. Ct. at 1404, 1410-11 (1986), applied the Fifth Amendment analysis of *Edwards v. Arizona* to Sixth Amendment analysis. *Michigan v. Harvey*, 494 U.S. 344, 349, 110 S. Ct. 1176, 1179 (1990).

were made to the Appellant in exchange for his statement, nor was he in any way coerced or threatened. Mabon testified that although the Appellant had already executed a waiver of his Fifth Amendment rights on a separate form, before the Appellant's statement was taken, he was again fully advised of his rights, including his right to counsel, his right to remain silent, and his right to "stop talking" at any time. Following this second admonition of rights, the Appellant gave a five-page statement, which he signed and ended at 2:06 p.m. In his statement, the Appellant acknowledged that he had called Sgt. Mabon in November 2004, and, he said she told him she was unable to talk to him about the case without an attorney being present.

Trial counsel testified that he was representing the Appellant in the fall of 2004 and that the Appellant had been incarcerated on the charges since March 2003. The trial court had appointed him to represent the Appellant after a conflict developed between the Appellant and his first attorney. Trial counsel stated that the District Attorney's office had contacted him and indicated that if the Appellant could assist in the identification of the "shooter," the State could possibly negotiate a settlement of the charges. After several weeks of discussions, the Appellant told trial counsel that he wanted to cooperate. The parties scheduled the statement for November 23, 2004, and trial counsel met with the Appellant in the interview room in preparation for the interview with Sgt. Mabon. The Appellant told trial counsel that he was "forcing him, coercing him" to give a statement and that the Appellant didn't want to participate. Trial counsel advised the Appellant that "[i]f you feel that I am forcing you to do things in this case that you would rather not do, that tells me that we have a conflict that may not allow me to continue in representing you." Further, counsel advised the Appellant, "until that issue is resolved, we are not going to give a statement today." Counsel left the room and advised Sgt. Mabon that "a potential conflict had arisen between [him and the Appellant] and that under these circumstances [they] could not go forward." Although the Appellant never said he did not want to talk to the police, trial counsel assumed that the officers would take the Appellant back to the jail. Trial counsel did not instruct Sgt. Mabon not to talk to the Appellant, and, a couple of hours later, he received a voicemail from Sgt. Mabon.

Trial counsel continued in his representation of the Appellant and, in December 2004, filed several pretrial motions. The police attempted to verify some of the information in the Appellant's statement, and trial counsel kept the Appellant and his family informed of those efforts. In the Summer of 2005, trial counsel learned that the Appellant had made arrangements to replace him with retained counsel.

The Appellant testified that, before the date of the interview, he had called Sgt. Mabon several times and told her he wanted to talk about his case. The Appellant and his attorney had several conversations about the upcoming meeting with Sgt. Mabon. On November 23, 2004, the Appellant met with trial counsel in the interview room, but some problems developed and counsel told him he intended to withdraw from the case. Trial counsel left the room, and the Appellant wanted to tell Sgt. Mabon that he was not at the victim's residence when the victim was shot. He acknowledged that he never told Sgt. Mabon that he wanted another lawyer or that he didn't want to talk to her. He knew he had a right to an attorney because trial counsel was the second lawyer to

represent him in this case.  However, he told Sgt. Mabon that he would not talk to her until trial counsel came back and that is why she left a voicemail message for him.

At the conclusion of the suppression hearing, the trial court made the following findings:

. . . [The Appellant] voluntarily set up this meeting with the police.  He initiated contact more than once.  Not only through his attorney but also himself with the police even though he had an attorney.

Sergeant Mabon said that he called her several times.  He initiated the contact.

[Trial counsel] told her that he was no longer going to represent him.  [The Appellant] in his statement, looking at the statement, here, says . . .

. . . .

. . . I told [trial counsel] that I wanted to tell the truth about the incident, and he said he was not going to represent me no more.

I find that [the Appellant] told Sergeant Mabon that he did not want [trial counsel] to represent him and that he wanted to make a statement.

I find that [the Appellant's] testimony at this hearing this morning is not credible.  I find that [trial counsel's] testimony is credible and that [Sgt. Mabon's] testimony is credible.

Now referring you all to *State v. Baker*, [931 S.W.2d 235, 236 (Tenn. Crim. App. 1996)], there's a list [of] cases in which the defendant already had an attorney and the police took his statement anyway[,] that was okay.

It's not unconstitutional if three things happen.  If he's given his Miranda rights.  If he initiated contact with the government.  And his attorney didn't tell the police not to question him.

In this case, all of those three things were met and I find that [the Appellant] waived his right to have his attorney present when he gave his statement, and there is no Constitutional violation pursuant to *State v. Baker*.

The proof at the hearing on the motion to suppress does not preponderate against the trial court's finding that the police did not violate the Appellant's constitutional right to counsel or his right against self-incrimination when he gave a formal statement.  First, the evidence supports the trial court's finding that the Appellant initiated contact with the police.  Second, the evidence supports the trial court's finding that the Appellant made a voluntary and knowing waiver of his

constitutional rights. Sgt. Mabon testified that she twice advised the Appellant of his *Miranda* rights, including his right to remain silent and his right to counsel, which he signed and acknowledged. The Appellant testified that he was aware he had a right to have an attorney present. The trial court noted "the record shows clearly that [trial counsel] says I am going to seek to withdraw and [the Appellant] says I still want to talk to [Sgt. Mabon]."

The trial court also considered that trial counsel did not instruct the police not to question the Appellant. However, a defendant may execute a valid waiver of the right to counsel notwithstanding the fact that his attorney instructed officers not to question the defendant. *Michigan v. Harvey*, 494 U.S. at 353, 110 S. Ct. at 1181; *McPherson v. State*, 562 S.W.2d 210, 213 (Tenn. Crim. App. 1977) (defendant made a valid waiver of Sixth Amendment right to counsel even though his attorney admonished police not to question defendant). "The U. S. Supreme Court has clearly sanctioned the admissibility [of] a statement given after the appointment of counsel and even after defendant has 'expressed his desire to deal with police only through counsel,' where defendant initiates further communication, electing 'to face the [S]tate's officers and go it alone,' and knowingly and intelligently waives his Sixth Amendment right to counsel. . . ." *State v. Cauthern*, 778 S.W.2d 39, 46 (Tenn. 1989); *see also Owens v. State*, 561 S.W.2d at 169 (statement was constitutionally valid where counsel was appointed for defendant; defendant contacted police, waived *Miranda* rights, and gave statement); *compare Brewer v. Williams*, 430 U.S. at 405-06, 97 S. Ct. at 1243 (defendant did not waive right to counsel where he had been arraigned, consulted with attorney, officers agreed not to question defendant while transporting him, defendant refused to answer questions until he talked to attorney but ultimately officers persuaded defendant to reveal incriminating information).

The trial court considered that the Appellant was not represented by counsel at the time he gave his statement. But, even if trial counsel were representing the Appellant, the Appellant could waive his right to representation. *State v. Claybrook*, 736 S.W.2d 95, 103 (Tenn. 1987) (defendant's statement was constitutionally valid where defendant, who was arrested and requested counsel, later initiated contact with law enforcement officials); *State v. Baker*, 931 S.W.2d at 235-36 (defendant, who was represented by counsel, knowingly and voluntarily waived right to counsel by making several phone calls to sheriff's deputies and their interview did not violate his right to counsel where his attorney did not prohibit officers from questioning defendant). As observed by Chief Justice Rehnquist, "[a]lthough a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will." *Michigan v. Harvey*, 494 U.S. at 353, 110 S. Ct. at 1182.

The Appellant also asserts that the waiver of his rights was not voluntary because he had been "informed by his attorney and Sgt. Mabon that concessions would be shown for his statement," thus, he argues the "hope of leniency" overcame his initial reluctance to talk to the police. Again, the trial court found the Appellant's testimony was "not credible" and accredited Sgt. Mabon's testimony that no promises or threats were made to obtain the statement.

In order for a confession to be admissible, it must be "free and voluntary; that is, [it] must not be extracted by any sort of threat or violence, nor obtained by any direct or implied promises,

however slight, nor by the exertion of any improper influence . . . ." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187 (1897). The focus of the reviewing court should be "whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined . . . ." *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). Some type of "coercive police activity is a necessary predicate to finding that a confession is not voluntary . . . ." *Smith*, 933 S.W.2d at 455. We conclude the record supports the trial court's finding that the Appellant's statement was constitutionally valid. Thus, after review of the evidence presented in the motion to suppress, we conclude that the evidence does not preponderate against the trial court's finding that the Appellant's statement was not taken in violation of his right to counsel and that his statement was knowingly and voluntarily given.

## II.     The Appellant's Statement as Rebuttal Testimony

The Appellant further asserts that the trial court abused its discretion when it permitted the State to introduce the Appellant's statement as rebuttal evidence. In ruling that the Appellant's statement was admissible in rebuttal, the trial court found that the statement "flatly contradicted" the exculpatory testimony of the two defense witnesses. On appeal, the State also asserts that the Appellant's statement was proper rebuttal testimony because it controverted the testimony of the Appellant's witnesses that Ware did not know the Appellant and that Ware fabricated his testimony to obtain leniency in his own cases. We agree.

Rebuttal proof is "any competent evidence which explains or is a direct reply to, or a contradiction of, material evidence introduced by the accused, or which is brought out on his cross-examination." *State v. Smith*, 735 S.W.2d 831, 835 (Tenn. Crim. App. 1987). The State is given the right of rebuttal because "it does not and cannot know what evidence the defense will use until it is presented at trial." *State v. Thompson*, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000). The determination of the admissibility of rebuttal evidence lies in the discretion of the trial court, and this court will not interfere with the trial court's ruling unless there has been a clear abuse of discretion appearing on the face of the record. *State v. Kendricks*, 947 S.W.2d 875, 884 (Tenn. Crim. App. 1996).

### a.     Admissibility of the Full Statement

On appeal, the Appellant asserts that the trial court should have limited the Appellant's statement to those portions which contradicted Wright's and Waller's testimony that Ware told them he didn't know the Appellant. He asserts that "[t]he court allowed the statement in [in] its entirety rather than those applicable sections." However, the Appellant's statement was admissible to contradict Waller's testimony that Ware did not know the Appellant, that the Appellant was not with Ware at the time of the shooting, and that Ware fabricated his testimony to obtain favorable treatment on his own charges. Thus, the trial court did not abuse its discretion in admitting the full statement.

**b.     State's Decision to Introduce Statement as Rebuttal Proof**

The Appellant also asserts that the State was required to introduce the Appellant's statement in its case-in-chief and that the trial court should not have permitted the State to introduce it in rebuttal. The Appellant argues that because he disclosed the nature of his witnesses testimony in opening statements, the State should have introduced the statement to preempt the impact of Wright and Waller's testimony. The State counters that the Appellant's argument is without legal foundation. However, the State acknowledges that it elected not to introduce the Appellant's statement in its case-in-chief because the statement contained, in addition to the rebuttal proof, a self-serving account by the Appellant of the shooting.

The Appellant cites *State v. West*, 825 S.W.2d 695, 698 (Tenn. Crim. App. 1992), for the proposition that the trial court should have excluded the Appellant's statement because the State should have introduced it in its case-in-chief. However, *West* is distinguishable because "in *West*, [the Tennessee Supreme Court] held that the testimony during rebuttal was improperly admitted because the testimony did not rebut anything and thus, it should have been proffered during the State's case in chief." *State v. Dellinger*, 79 S.W.3d 458, 489 n.12 (Tenn. 2002). In the instant case, the Appellant's statement clearly rebutted Wright and Waller's testimony. Thus, the trial court did not abuse its discretion in refusing to exclude the Appellant's statement on the ground that the State should have presented the statement in its case-in-chief.

## III.     Trial Court's Use of Curative Instruction

Finally, the Appellant asserts the trial court erred in giving a curative instruction in one instance and in denying his request for a curative instruction in another. First, the Appellant contends the trial court should not have given an instruction, during his cross-examination of Sgt. Mabon, which informed the jury that the trial court had determined that the officers had not violated the Appellant's constitutional rights during the taking of the Appellant's statement. Second, the Appellant contends the trial court abused its discretion when it failed to give a curative instruction during the State's closing argument because, he asserts, the prosecutor misstated certain facts.

### a.     Trial Court's Curative Instruction

The Tennessee Constitution prohibits judges from commenting on the evidence in a case. Tenn. Const. art. VI, § 9. A trial judge is obligated to "be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 407 (Tenn. 1989).

During cross-examination of Sgt. Mabon in rebuttal, several questions were asked with regard to the status of the Appellant's attorney-client relationship at the time the Appellant's statement was obtained. Sgt. Mabon was specifically asked whether she had a "court order" to show that the Appellant's previous trial counsel had in fact been discharged, at which time the trial judge

-10-

requested that the prosecutor and defense counsel approach the bench. At this conference, the trial judge commented:

> I guess my problem is that whether [Sgt. Mabon] had a court order or not, it was just simply not relevant. I've already ruled that it's admissible.
>
> And so if you are going to try to tell the jury that somehow she did something wrong by taking his statement, then I'm going to have to give the jury a curative instruction. And tell them that I had a hearing on this and I found that she acted properly. I don't want to do that.

Upon trial counsel's return to cross-examination of Sgt. Mabon, two similar questions were immediately asked of the witness with regard to whether the Appellant's trial counsel had been "discharged." At this point, the trial judge interrupted the proceedings and instructed the jury as follows:

> Let me say this, [l]adies and gentlemen, I need to make this comment. I hate to interrupt you. We had a hearing on this, this morning, and [the Appellant's previous trial counsel] was brought to court at eight thirty and testified.
>
> We heard proof on this and I found at that hearing that [trial counsel] left not intending to represent [the Appellant] anymore. [The Appellant] understood. He did not want [trial counsel] to represent him.
>
> And so this officer did not do anything wrong in talking to [the Appellant].
>
> In other words, if I found that any of [the Appellant's] Constitutional rights had been hurt by this officer taking the statement or that she had done anything improper, then I would not have allowed the statement in.
>
> But [trial counsel] had an emergency and we brought him in really early this morning about this case. And he and [the Appellant] decided to part ways.
>
> And I found that it was proper for this officer to take the statement. She did not try to subvert the attorney/client relationship.
>
> We just need to make that clear. Neither side is going to suggest that there is anything illegal being done here. . . .

As argued by the State, no objection was entered at trial by the Appellant with regard to the trial court's curative instruction. Moreover, no challenge to the curative instruction was raised in the Appellant's motion for new trial. Because the issue may not be raised for the first time on appeal, it is waived. *See* Tenn. R. App. P. 36(a). Furthermore, plain error review is unwarranted

-11-

because we are unable to conclude that the trial court's comments within the curative instruction "more probably than not affected the judgment" or "result[ed] in prejudice to the judicial process." *See* Tenn. R. App. P. 36(b).

It is undisputed that the trial court has discretion to *sua sponte* limit testimony that is irrelevant. *State v. Dooley*, 29 S.W.3d 542, 548 (Tenn. Crim. App. 2000); *State v. Combs*, 945 S.W.2d 770, 774 (Tenn. Crim. App. 1996). Furthermore, the party complaining of an improper comment by a judge ordinarily must show that the comment was, with practical certainty, unfairly prejudicial. *State v. Caughron*, 855 S.W.2d 526, 536-37 (Tenn. 1993). Here, the trial court's comment was offered to clarify a legal ruling and, as such, did not reflect upon the weight or credibility of a disputed fact in evidence.

### b. Trial Court's Denial of Requested Instruction

During closing argument, the Appellant requested that the trial court give a curative instruction to the jury to remedy what he asserted was the prosecutor's misstatement of the evidence. The prosecutor argued to the jury that Ramirez identified Ware and the Appellant as two of the three intruders in his house. The Appellant objected and stated, "I don't believe that there's any proof in the record that Mr. Ramirez identified Mr. Ware. There's nothing in the record to reflect that and I would like some curative instruction." Specifically, the Appellant asked the trial court to "instruct [the jury] that there was no proof here that Mr. Ramirez identified Mr. Ware." The trial court explained, "I can't comment on the facts, what was testified to and what wasn't testified to." However, in an abundance of caution, the trial court gave a general curative instruction that, "Statements, arguments, and remarks of counsel . . . are not evidence. And this charge specifically orders you that if any statements were made that you believe are not supported by the evidence, you should disregard them." The record demonstrates that Ramirez identified Ware in a photographic lineup a few days after the shooting, and he identified the Appellant in a photographic lineup several months later. Thus, this issue is without merit.

### CONCLUSION

Based upon the foregoing, the judgments of the Shelby County Criminal Court are affirmed.

_____
DAVID G. HAYES, JUDGE