# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 8, 2011 Session

## STATE OF TENNESSEE v. CANDANCE ORRAND BUSH and GARY W. BUSH

### Appeal from the Circuit Court for Rutherford County
### Nos. F-61320A, F-61320B        Don R. Ash, Judge

### No. M2010-00186-CCA-R3-CD - Filed July 18, 2011

Following a jury trial, the Defendants, Candance Orrand Bush and Gary W. Bush, were convicted of first-degree murder, a Class X felony, for the 1982 killing of Lynn Orrand. See Tenn. Code Ann. § 39-2-202 (1982). Both Defendants were sentenced to imprisonment for life. In this appeal as of right, the Defendants raise the following issues: (1) Defendant Orrand[1] contends that the trial court erred in failing to disqualify District Attorney General William C. Whitesell, Jr. and his office from prosecuting this case; (2) Defendant Bush contends that the trial court erred by admitting into evidence a tape recording of a phone call between Defendant Bush and Jason Riley; (3) both Defendants contend that the evidence was insufficient to sustain their convictions because it was based upon the uncorroborated testimony of an accomplice, Kevin Patterson; and (4) Defendant Bush contends that the trial court erred by failing to select the alternate jurors "in plain view." Following our review, we conclude that these issues have no merit and affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

John H. Norton, III and Liberti Anne Snider, Shelbyville, Tennessee, for the appellant, Candance Orrand Bush.

---

[1]Because both Defendants share the same last name we will refer to Defendant Candance Orrand Bush as Defendant Orrand, her last name at the time of the offense, and Defendant Gary W. Bush as Defendant Bush.

John Galloway Mitchell, Jr. and John Galloway Mitchell, III, Murfreesboro, Tennessee, for the appellant, Gary Bush.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

*I. The Murder of Lynn Orrand*

In 1981, Defendant Orrand was married to the victim, Lynn Orrand. The Orrands and their two children, Terry and Gary, lived in a house on Peachtree Street in Murfreesboro. Lynn[2] worked at North American Car while Defendant Orrand worked for a company called Gemtop. During this time, Defendant Orrand and Defendant Bush were coworkers at Gemtop. At some point in 1981, Defendant Orrand's younger brother, Kevin Patterson, came to live with the Orrands. Kevin had been kicked out of his parents house because his girlfriend was pregnant. Kevin lived with the Orrands until he married his girlfriend and moved in with her parents in December 1981.

On November 18, 1981, Lynn was returning home from work some time around 2:00 a.m. when he entered an unlocked side door to his garage. As Lynn entered the garage, he was struck in the head with "a tire tool" by an unknown assailant who then fled the scene. Gary Orrand later testified that on the night of the attack he woke up to the sound of his father, Lynn, calling for Defendant Orrand "to get the gun." According to Gary, Defendant Orrand went through the hallway crying, but "she wasn't hysterical." Defendant Orrand told Gary to "lay back down, it would be okay." Officer Ricky Keyt responded to the Orrand residence on the night of the attack. Officer Keyt testified that he remembered Lynn was bleeding from a cut under his right eye before he was transported to the emergency room. Officer Keyt did not observe any signs that the intruder had broken into the garage. Officer Keyt testified that witnesses described the assailant as a white male wearing a blue jacket with fur trim. Officer Keyt spoke with Defendant Orrand about the assault, and she told him that she had received two phone calls "from an unidentified person." Defendant Orrand told Officer Keyt that the caller had informed her "that her husband was selling drugs" and that

---

[2]Because the victim, Defendant Orrand, and many of the witnesses share the same last names we will refer to some of the people involved in this case by their first names. No disrespect is intended.

"he had been seen going into a bar with two other women." Lynn was subsequently hospitalized, underwent surgery for his injuries, and missed two months of work.

Prior to the attack, Lynn had been hunting a large buck in the woods near the home of Defendant Orrand's parents. According to Defendant Orrand's mother, Norma Jean Patterson, although Lynn had set up a tree stand in the woods, he would often hunt on a rock near a deer trail where "[h]e could sit . . . [and] watch the deer." Defendant Orrand told her mother "not to tell anybody where [Lynn] was hunting at." On January 14, 1982, Lynn spoke with his coworker and friend, A.J. Mullins, about hunting for the buck that weekend. Later that night, Mr. Mullins remembered that deer season had ended and told Lynn he would not go hunting with him. Before they left work, Lynn told Mr. Mullins "that he changed his mind also" and would not go hunting that weekend. In the early morning hours of January 15, 1982, Kevin's girlfriend gave birth to their daughter Kimberly. Kevin spent that night at the Orrand house because there had been a significant winter storm and their house was near the hospital. That night, Defendant Orrand called her mother to tell her that Lynn was coming over to their property "early the next morning" to hunt for the buck. Defendant Orrand's mother overheard Kevin and Lynn talking in the background. According to Defendant Orrand's mother, the only people who knew Lynn would be hunting the next morning were Defendant Orrand, Kevin, and herself.

On the morning of January 16, 1982, Gary Orrand woke up to hear Defendant Orrand and Lynn "[t]alking about going and killing a deer and them kind of joking." At approximately 6:00 a.m., Defendant Orrand's mother awoke to the sound of a truck pulling into her driveway. Defendant Orrand's mother looked out her window and saw Lynn's white pickup truck. Defendant Orrand's mother then heard the truck door slam and went back to sleep. Approximately 10 to 15 minutes later, Defendant Orrand's mother woke up again because her husband was getting out of bed. He told her that he had heard two gunshots and figured "Lynn has shot him a deer" so he would fix some coffee and wait for Lynn to come down to the house. Defendant Orrand's mother and father waited for Lynn until approximately 10:00 a.m. At that time, Defendant Orrand's mother became worried about Lynn and sent her husband and her youngest son, John Patterson, to the woods to check on Lynn. John saw one set of footprints in the snow leading from Lynn's truck and into the woods. John and his father followed these footprints until they found Lynn's body. John's father "rolled [Lynn's body] over" and attempted to resuscitate him. John told his father to stop because it was too late, Lynn was already dead. John then went back to the house to tell his mother to call the police.

Defendant Orrand's mother went with several police officers to Defendant Orrand's house in order to tell her that Lynn had been killed. When told, Defendant Orrand "just went, awwww" and grabbed her mother by the shoulder and shook her saying, "If you had

called the ambulance he might not would have died." Defendant Orrand's mother thought this was odd because Defendant Orrand had no reason to know that Lynn "had been laying out there in the snow . . . dead for several hours." Defendant Orrand's mother testified that Defendant Orrand "was acting a little weird," seemed "nervous," and "was and wasn't" upset when told about Lynn's death. Defendant Orrand's neighbor and friend, Lorraine Perry, testified that Defendant Orrand seemed "very calm" and "[n]ervous more than upset" that day. Ms. Perry did not remember Defendant Orrand crying that day and testified that she "cried more" than Defendant Orrand did. The next day, Defendant Orrand went to view Lynn's body at the funeral home with Lynn's twin brother, Glenn Orrand. According to Glenn, Defendant Orrand began crying and said "I want him back now" repeatedly. Shortly after the funeral, Kevin, his wife, and their child moved in with Defendant Orrand and her children for approximately two or three months.

Defendant Orrand retained the services of attorney Jeff Henry to assist her as administrator of Lynn's estate, filing for compensation from the Criminal Injuries Compensation Fund (CICF), and filing for the benefits from Lynn's life insurance policy. At the time, Defendant Orrand and Lynn had five dollars in their joint checking account and owned no real property. Defendant Orrand received $50,000 as the beneficiary of Lynn's life insurance policy and received $10,000 from the CICF. From 1984 until 1989, Defendant Orrand, as Lynn's widow, collected Social Security benefits totaling $21,453. Defendant Orrand also collected Social Security benefits on behalf of Gary and Terry from 1984 until 1992 totaling $77,428. Defendant Orrand eventually bought a house "a few blocks down from the one that she lived in" and paid for it in cash. In 1989, Defendant Orrand and Defendant Bush married. As the years went on and the police investigation stalled, Defendant Orrand never expressed any frustration over the fact that Lynn's murder remained unsolved. Defendant Orrand never talked to her children about Lynn's death or sought counseling for them. On one occasion, Terry found a newspaper article about Lynn's murder. Defendant Orrand took the article away from Terry before he could read it telling him that it "was all lies."

*II. The Police Investigation and Forensic Evidence*

Chief Deputy Virgil Gammon of the Rutherford County Sheriff's Department was the lead investigator on the case in 1982. He received a call from the dispatcher about a shooting at approximately 10:30 a.m. on January 16, 1982. When he arrived, Chief Gammon saw Lynn's body lying on the ground next to a rock that "looked to have had some damage" to it. Lynn had been shot in the back near "the upper left shoulder." There were no footprints around the body but a search of the area revealed two sets of footprints near a tree approximately eight to ten yards from Lynn's body. There were no footprints between the body and the tree. Both sets of footprints appeared to be from the same person and

"appeared to be comings and goings." Chief Gammon "believed that someone had been standing or sitting or waiting" for Lynn by the tree. Chief Gammon followed the footprints as they "circled around up [a] hill and back down the hill." The footprints continued on across Richland Road and back into the woods behind "three or four houses and came out" at an old, abandoned church down the street. Chief Gammon believed that the footprints leaving the scene were "at a faster pace or running" because of the stride and "distance between the steps." At one point along the footprints, the police discovered an area where the snow was disturbed. Chief Gammon believed that the assailant had fallen and dropped his gun. There were indentations in the snow that appeared to be where the assailant's knee touched the ground and where he placed his hand "trying to get up." There was also an indentation Chief Gammon believed was of a "double barrel shotgun." At the abandoned church, police found "tire marks" in the snow showing "where a vehicle had been at one point." The police were able to determine that the footprints came from "a hunting style boot."

Michael Cawthorn, then the deputy coroner for Rutherford County, examined Lynn's body on January 16, 1982. Mr. Cawthorn observed "perforations" around the left elbow and a "one inch hole in the mid back." Mr. Cawthorn also observed "what appeared to be the outline of . . . something metallic under the left pectoral muscle." Mr. Cawthorn removed "a shotgun slug" from Lynn's body along with some "wadding" behind the slug. Mr. Cawthorn opined that the murder weapon was either a 12 gauge or 16 gauge shotgun and leaned "more toward a 12 gauge based on the amount of slug that was there." No autopsy was performed on the body in 1982. In 1982, Tennessee Bureau of Investigation (TBI) Assistant Director Lanny Wilder examined the shotgun slug recovered from Lynn's body. Assistant Director Wilder concluded that the slug was fired from a 12 or 16 gauge shotgun, but the slug's weight "was closer to a 12." Assistant Director Wilder concluded that the slug was a "rifled slug," which allowed the weapon to be fired with more accuracy. Assistant Director Wilder also opined that it would not be unusual for shotgun wadding to penetrate a body if the shot was fired from eight to ten yards away, especially if the wadding followed behind the slug.

Lynn's body was exhumed in 2007 and an autopsy was performed by Dr. Adele Lewis. The autopsy revealed a "large roundish shaped wound" and "multiple smaller wounds surrounding that" on Lynn's back. The slug traveled "through the ribs" and injured the spleen, left lung, and heart. Dr. Lewis opined that these injuries "would almost certainly be fatal within a matter of 30 seconds to a minute." Dr. Lewis also found "several small shotgun wounds" on the left arm, "right above [the] elbow." Dr. Lewis recovered several fragments from the body which she submitted to the TBI for testing. Dr. Lewis opined that the victim's wounds were consistent with having been "shot once with a slug . . . in the back" and having been struck by fragments from a second shot that struck a nearby rock. TBI

Special Agent Robert Royse examined the fragments recovered from Lynn's body in 2007. Special Agent Royse concluded that one of the fragments was a piece of rock but that the other fragments were consistent with being from a deer slug.

### III. Kevin Patterson's Confession

In March 2007, police received information from Lonnie Butcher, an inmate at the Rutherford County jail, which implicated Kevin Patterson in Lynn's death. On March 17, 2008, Kevin pled guilty to one count of second degree murder for shooting Lynn and is currently serving a 25-year sentence. At the Defendants' trial, Kevin testified that in the autumn of 1981, he moved in with Defendant Orrand and Lynn because he "wasn't getting along very good" with his father. Kevin was 17 at the time and a senior in high school. After moving in with the Orrands, Kevin learned that Defendant Orrand and Defendant Bush were "lovers" and were having an affair together. Kevin never told Lynn about the affair because he "didn't want to get [his] sister in trouble." Defendant Orrand wanted Kevin to meet Defendant Bush and "see what [he] thought about [Defendant Bush]." Defendant Orrand arranged for the two to meet at a local store. Kevin rode to the store on his bicycle and found Defendant Bush at a pay phone talking to Defendant Orrand. Defendant Bush introduced himself to Kevin and shook his hand. Kevin and Defendant Bush talked for "[m]aybe two minutes" before Kevin left. After Kevin learned about the affair and met with Defendant Bush, Defendant Orrand began to ask Kevin to kill Lynn. Kevin testified that Defendant Orrand asked him on "several occasions" to kill Lynn and that she would often do it while she was on the phone with Defendant Bush. However, Kevin testified that he could not remember the first time Defendant Orrand asked him to kill Lynn because he "put a lot of this stuff out of [his] mind because of what [he] did." Defendant Orrand told Kevin that she wanted Lynn killed because "she couldn't divorce him because he wouldn't leave her alone."

After being asked to kill Lynn, Kevin approached his friend Jason Riley and "asked him if he'd be interested in killing somebody for $5,000." Kevin had previously asked Jackie Young if he would kill someone for money, but Mr. Young had refused. Kevin decided to ask Mr. Riley because he was "a roughneck" and "was known to go out to . . . [construction sites] and steal[] shingles and supplies." Kevin told Defendant Orrand, while she was on the phone with Defendant Bush, that Mr. Riley had agreed. A meeting was setup between Defendant Bush, Mr. Riley, and Kevin. Kevin testified that he could not remember where the meeting took place but that he picked up Mr. Riley. Defendant Bush was waiting for them in his black Ford pickup truck. All three men got into the truck, and Defendant Bush showed Mr. Riley an envelope that had money in it. Kevin testified that he got out of the truck while Mr. Riley and Defendant Bush discussed the details of the plan to kill Lynn. On November 18, 1981, Kevin picked up Mr. Riley and drove him to Lynn's house. Kevin

testified that Mr. Riley waited in the garage for Lynn and that when Lynn came home, Mr. Riley struck him over the head with "a bat or something another." Defendant Orrand told Kevin that the plan was for Mr. Riley to hit Lynn over the head and then drag his body to the road, but Mr. Riley "didn't knock [Lynn] out and [Mr. Riley] got scared and took off running." Kevin testified that he had been "riding around the neighborhood" for about 30 minutes waiting on Mr. Riley to kill Lynn when he picked Mr. Riley up "[d]own the road from the house." Mr. Riley was "scared to death" and told Kevin that he had hit Lynn but "it didn't knock him out." Lynn had started to fight back so Mr. Riley "took off running." Kevin dropped Mr. Riley off back at his vehicle and never spoke to Mr. Riley about the attack again.

After the failed attempt to kill Lynn in the garage, Kevin agreed to kill Lynn himself. Defendant Orrand and Defendant Bush devised a new plan. Defendant Orrand offered to let Kevin, his then girlfriend, and their child move into her house and to pay him $5,000 in exchange for killing Lynn. Kevin testified that the plan was for him to shoot Lynn while he was hunting for the buck in the woods near Defendant Orrand's parents' home. Kevin testified that Defendant Bush was to provide him with a shotgun and leave a station wagon with "a pair of coveralls, a pair of gloves, and a hat" inside at the "national guard armory." Kevin would then drive the station wagon to an abandoned church near the woods. Kevin testified that prior to the murder, he met with Defendant Bush at the Jackson Heights parking lot, where Defendant Bush gave him a double barrel shotgun "wrapped up in a blanket." Defendant Bush also gave him two sets of shotgun shells, a set of "regular shotgun shells" to use for target practice, and a set of deer slugs to use for the murder. Kevin put the shotgun and the shells into the truck of the car, a Grand Prix owned by his girlfriend's brother. Kevin testified that his pregnant girlfriend was hidden, lying down in the seat, when Defendant Bush gave him the gun. Kevin also testified that after he married his girlfriend in December 1981, he moved in with her parents and practiced shooting at "some old junk cars out there" on his father-in-law's property, firing the gun twice.

On January 15, 1982, Kevin's daughter was born. According to Kevin, he had a conversation with Defendant Orrand about the murder that day. Defendant Orrand told Kevin that Lynn would be hunting on their parents' property the next morning and that after the murder, Kevin should go back to the hospital "and get in the room with [his] wife and make like [he had] been there the whole time." Kevin also testified that Defendant Orrand spoke with Defendant Bush about the murder over the phone that day. Kevin spent that night at the Orrand house and woke up around 4:30 a.m. on January 16, 1982. Defendant Orrand and Lynn were drinking coffee and talking when Kevin woke up. Kevin testified that Lynn "was about to talk himself out of going [hunting] that morning" but that Defendant Orrand "was pushing him to do it." Kevin also testified that he remembered Defendant Orrand "at some point in time" having a phone "conversation with [her] mother . . . letting her know that

-7-

Lynn was coming out there that morning to go hunting." Kevin left the Orrand house while it was still dark outside and before Lynn had left to go hunting. Kevin drove his wife's brother's car "to the national guard armory." As planned, there was a station wagon parked at the "armory" with the keys "under the floor mat." Kevin testified that when he got to the "armory," there were no other cars in the parking lot and the lights were off in the building. Kevin also testified that he had kept the shotgun in the trunk of his wife's brother's car since he got it from Defendant Bush. Kevin took the shotgun out of the car and put it in the station wagon. Kevin then put on the coveralls, gloves, and ski mask he found in the station wagon and drove toward his parents' house.

Kevin parked the station wagon at the abandoned church on Richland Road. It was cold and there was snow on the ground when he got to the church. Kevin "walked through the woods down close to where [his] father's property was at and then crossed the road and went up in the woods." Kevin walked to a tree where he crouched down and waited "for about probably 30 minutes or so." Kevin then heard Lynn's truck pull up the driveway, Lynn get out of the truck, and Lynn enter the woods. As Lynn approached Kevin, Kevin came out from behind the tree and "was probably 30 feet from [Lynn]" when he fired a shot. Kevin thought he missed Lynn so he fired a second shot. He knew he "didn't miss the second time" because he heard Lynn say, "You got me." Kevin testified that the two shells he fired at Lynn were both deer slugs. At the preliminary hearing in this case, Kevin testified that Lynn was walking toward him and facing him when he fired. After hearing Lynn say "You got me," Kevin "took off running." Kevin testified that he ran away from Lynn and the station wagon "up in the woods a little bit" before "running back toward where the car was at," going the same way back to the car as he had come. As he was running, Kevin "tripped over a log or a rock or something" and fell and dropped the gun in the snow. Kevin "reached down and picked the gun up and took off running again." When Kevin reached the station wagon, he put the gun in the back seat and drove back to the "armory" still wearing the coveralls, gloves, and ski mask. Kevin parked the station wagon at the "armory," removed the coveralls, gloves, and ski mask and left them along with the gun in the station wagon. Kevin testified that he never asked and never learned what happened to the station wagon and the other items.

After leaving the station wagon at the "armory," Kevin drove to the hospital. Kevin testified that he "waited around out in the hallway until . . . [he] didn't see any nurses around the nurse station." He then "snuck in [his] wife's room without anybody seeing [him]" and "made like [he had] been there a while" and "acted like [he] was asleep in the chair." Kevin's wife was asleep when he entered her hospital room. After she woke up, Kevin told her that he had killed Lynn. Kevin testified that she was upset, but he could not remember what she said. Kevin also testified that she had previously known about the plan to kill Lynn and that she helped him with his alibi. Kevin left the hospital and eventually went to

Defendant Orrand's house, where their mother and "a bunch of detectives" were as well. Kevin was eventually questioned by the police, and he told them that he was at the hospital with his wife at the time of the murder. A few days after the murder and after having spoken with the police, Kevin realized that he "still had the same shoes on that [he] had on when [he] committed the crime." Kevin went behind a K-Mart and threw the shoes into a dumpster. Kevin testified that he could not remember what type of shoes he had worn during the murder. Kevin admitted that at the preliminary hearing, he had testified that he was wearing a normal pair of "lace up shoes." However, Kevin also testified that in the past he had owned a pair of Herman boots, that he could have owned a pair at the time of the murder, and that he considered Herman boots to be "lace up shoes." Kevin, his wife, and their child then moved in with Defendant Orrand. However, they did not live there long because Defendant Orrand and his wife did not get along so Defendant Orrand "kicked [them] out." Kevin testified that he never received the $5,000 but only got "$100 here, $100 there." Kevin also testified that sometime after the murder, he told Lonnie Butcher that he had killed Lynn for the Defendants.

After moving out of Defendant Orrand's house, Kevin "kind of stayed away" from Defendant Orrand because he "just couldn't look at them boys [Terry and Gary Orrand] in the face anymore." However, in 2007 Kevin was contacted by detectives who were reopening the investigation. Kevin testified that after he was contacted by the police, he went to the Defendants' house and spoke to them. The Defendants told him to "stay calm and keep [his] mouth shut and just stick with the story." Kevin testified that over the course of the investigation, he went over to the Defendants' house "four or five" times and they would meet in the garage. To avoid "listening devices and all this," the Defendants and Kevin would "whisper in real low voices while [they] [were] talking about it" and would sometimes "write notes and pass them instead of even talking." Kevin testified that they destroyed the notes. During this time, the Defendants gave Kevin "about $1,000" to pay off his fines and fees related to his probation. The Defendants gave Kevin the money on two occasions. The first time Defendant Orrand gave him money, and the second time Defendant Bush gave him money after "[h]e wiped all the money off removing any fingerprints on it." Kevin repeatedly denied to the police having any involvement in Lynn's murder. However, after meeting with an attorney, Kevin confessed to the police and agreed to testify and "tell the truth" against the Defendants in exchange for a 25-year sentence. Kevin testified that he did not want to kill Lynn, but Defendant Orrand "brainwashed [him] into killing [Lynn]" in exchange for $5,000 and allowing Kevin and his family to move in with her. Kevin further testified that he felt "terrible" about what he did and that he would not have pled guilty and "volunteer[ed] to take 25 years if it wasn't the truth."

At trial, Kevin admitted to having prior convictions for passing worthless checks and theft of property valued less than $500. Kevin testified that he had a good relationship with

Lynn and denied that he and Lynn had any conflicts or that Lynn did not want him to move into the Orrands' home. Kevin also denied that Lynn had kicked him out of the house prior to his having moved in with his wife's parents. On cross-examination, Kevin admitted that at the preliminary hearing, he testified that when Defendant Bush gave him the shotgun, it was not wrapped up and that he did not mention that his girlfriend was at the meeting. Kevin also admitted that he told the police he was given the gun one week before the murder. Kevin admitted on cross-examination that at the preliminary hearing, he testified that the station wagon had been left at the "armory" for a week prior to the murder. However, Kevin testified at trial that he could not remember when he got the shotgun or when the station wagon was left at the "armory." On cross-examination, Kevin testified that he finally decided to kill Lynn after his daughter was born, then he testified that it was after his wedding, and finally testified that he could not remember when he decided he would kill Lynn for the Defendants. Kevin testified that he had trouble remembering the details because it happened so long ago and because he "blocked a lot of this stuff out of [his] mind because it was a very, very bad thing to do." At trial, the Defendants established that the national guard armory Kevin testified he picked up and dropped off the station wagon at was not built until 1984. However, Kevin testified that the Defendants told him where to retrieve the station wagon and gave him directions on how to get there. Kevin further testified that he followed those directions. The State also established that there was another national guard armory located in Murfreesboro prior to 1984.

*IV. Corroborating Evidence*

Defendant Orrand's mother, Gary Orrand, Kevin's brother John, and Terry all testified that Kevin had a good relationship with Lynn. However, Terry Orrand testified that Defendant Orrand and Lynn had a "rocky" relationship and that he could remember the two fighting "over finances." Defendant Orrand told her friend and coworker, Barbara Poague, that she was "not happy" with Lynn and that Lynn "hit her." Defendant Orrand also told Ms. Poague that she would not divorce Lynn because "Lynn would not leave her alone and he would take her boys away from her." Prior to his death, Lynn spoke with his brother Glenn about his life insurance policy. Lynn told Glenn that he was thinking about dropping his life insurance. Glenn asked Lynn if he had dropped his insurance a few weeks later, and Lynn said that he had not dropped it but had actually increased the amount of coverage. When Glenn asked Lynn about his life insurance, Defendant Orrand "grinned" and said, "Lynn, if something was to happen to you, if I would have you killed, I'd be a rich woman." Lynn had also spoken to his friend and coworker, Mr. Mullins, about his life insurance policy. Lynn told Mr. Mullins that his wife was the sole beneficiary of the policy. Mr. Mullins urged Lynn to make his children beneficiaries as well. Mr. Mullins testified that Lynn did not get the chance to change his policy before he died.

Several former Gemtop employees testified that it was common knowledge at Gemtop that Defendant Orrand was having an affair with Defendant Bush around the time of Lynn's murder. Ms. Poague confronted Defendant Bush about whether he had anything to do with the attack on Lynn in November 1981. Defendant Bush's ex-wife, Patricia Conner, testified that she met Defendant Orrand in October of 1981 or 1982 and that she "sort of suspected [the Defendants] were going together." Defendant Bush and Ms. Conner divorced on August 29, 1983. Defendant Orrand's friend and neighbor, Ms. Perry, testified that she saw Defendant Bush's black Ford pickup truck at the Orrands home a few months after Lynn's murder. Defendant Orrand's niece, Christy Rawls, testified that she stayed at Defendant Orrand's house during the summer of 1982 and that Defendant Bush would come over to the house. Ms. Rawls testified that she saw Defendant Bush kiss Defendant Orrand and that the two "appeared to be a couple." Gary testified that he recalled seeing Defendant Bush kiss Defendant Orrand in 1983. However, when the Defendants spoke to Detective Jim Tramel of the Rutherford County Sheriff's Department, they denied having an affair and told Detective Tramel that they did not start dating until around 1985 or 1986.

Jackie Young testified that he was friends with Kevin in high school and that in 1981 Kevin asked him if he would "kill somebody for $10,000." When Mr. Young said no, Kevin told him that he was just joking. Mr. Young testified that he thought Kevin was serious before Kevin told him he was joking. Jason Riley testified that one night in 1981, he was in the parking lot of Jackson Heights when a black pickup truck with Kevin and another man inside pulled up. Mr. Riley had "hung out pretty good" with Kevin in high school and continued to "hang out" with him even after Mr. Riley had dropped out of high school. After the pickup truck pulled up, Kevin "hollered" for Mr. Riley to get in the truck. Mr. Riley testified that when he got into the truck, Kevin introduced the driver as "his sister's boyfriend." The driver pulled an envelope with $5,000 out of his jacket and handed it to Kevin. Mr. Riley testified that at the time, Kevin did not work and would not have had access to $5,000. Kevin placed the money on the dash and told Mr. Riley "this right here could be yours" if Mr. Riley would kill Kevin's brother-in-law. Kevin explained that his sister wanted her husband dead because "[h]e was abusive" and because the Defendants wanted to marry. Mr. Riley testified that he refused to kill Lynn, but he agreed to "knock [Lynn] out and drag him to the street," where Kevin and Defendant Bush would "take out the trash."

On November 18, 1981, Mr. Riley met Kevin in the Hardee's parking lot. Kevin was in a black Ford pickup truck when he held up the envelope of money and said, "This right here could be yours." Mr. Riley testified that he could not remember if there was anyone else with Kevin in the pickup truck. Kevin had previously driven him by the Orrand house. However, that night, Mr. Riley took his own car because he does not "like being stranded nowheres." Mr. Riley testified that he could not remember where he parked his car, but he

-11-

parked it "out of the way where nobody could see it." Mr. Riley walked about a block to Lynn's house and entered the garage through an unlocked side door. Terry Orrand testified that the side door in the garage was always unlocked and that Lynn would always come in through that door. Mr. Riley brought a flashlight and a "tire tool" into the garage with him. Mr. Riley testified that the flashlight was to signal "two people in the truck," who were waiting at the abandoned church. Mr. Riley hid behind the door he had entered and waited until he hear Lynn park his car in the driveway, get out, and walk toward the side door of the garage. After Lynn walked through the door, Mr. Riley hit him in the head with the "tire tool." The blow did not knock Lynn out, and Mr. Riley ran out of the garage after Lynn either "pulled a gun or said he had a gun." Mr. Riley testified that he ran through the front yard, back to his car, and drove away. Mr. Riley also testified that he wore a green army jacket with a hood which had "fur around it." However, Mr. Riley later testified that he did not remember the hood of his jacket being lined with fur. Mr. Riley testified that he attacked Lynn because he was "young" and "dumb" and that after the attack Kevin "just seemed like he disappeared."

Kevin's ex-wife, Joyce Hudson, testified that in 1981, Kevin told her that the Defendants were having an affair. Kevin also told her that Defendant Orrand was "looking for somebody to kill her husband." Ms. Hudson testified that she told Kevin "to stay away from [Defendant Orrand]." Kevin also told Ms. Hudson that the Defendants had "hired somebody to hit [Lynn] in the head and it didn't kill him." One day in 1981, Kevin asked Ms. Hudson to go with him to Jackson Heights to "get some pot." Kevin told her that "he wanted [her] to get down in the car because he didn't want this guy to see [her]." Ms. Hudson testified that even though she was pregnant at the time, it was not a problem for her to lie down in the seat because she "never showed" while she was pregnant. At one point, Ms. Hudson "peeked" out the window and saw a black Ford pickup truck parked next to the car. Ms. Hudson then saw Kevin put something in the trunk of the car that "was covered with a piece of cloth" and "was long." Ms. Hudson testified that it "looked like a gun." However, Ms. Hudson admitted on cross-examination that she originally told the police she thought Kevin had placed drugs in the trunk. After Kevin got back in the car, Ms. Hudson sat up. Kevin told her to get back down when the black Ford pickup truck drove by them. Ms. Hudson saw a man driving the truck and asked Kevin who it was. Kevin told her that it was Defendant Bush and that he was Defendant Orrand's boyfriend. Ms. Hudson testified that to her knowledge, Kevin did not own a gun at the time. Ms. Hudson also testified that she later saw Defendant Bush again in the same black truck he drove the night of the meeting. Defendant Bush's ex-wife, Ms. Conner, testified that Defendant Bush owned coveralls and "a long shotgun" at that time.

Ms. Hudson testified that after Kevin moved in with her parents, Defendant Orrand would call to speak to Kevin "a lot." The day after giving birth to her daughter, Kevin came

into Ms. Hudson's hospital room and told her that he had shot Lynn. Kevin told her that he had parked at the abandoned church on Richland Road and "hiked up in the woods and waited on [Lynn]." Kevin told her not to tell anyone about it because Defendant Orrand was "crazy enough to have [Ms. Hudson] killed." Ms. Hudson testified that she did not believe that Kevin would kill Lynn because "[h]e didn't tell me he was going to do it." Ms. Hudson denied having any role in Lynn's murder and denied that she agreed to help Kevin with his alibi. Ms. Hudson testified that after the murder, she, Kevin, and their child moved in with Defendant Orrand for about two months. When Defendant Orrand "kicked them out," Kevin started calling her names and said that Defendant Orrand "wanted [Lynn] dead" and that she "wanted [Kevin] to kill him." Sometime after that, Kevin came to Ms. Hudson and told her they were going to have to leave town because he had told his "friends" that he had killed Lynn. Ms. Hudson testified that she was afraid to divorce Kevin and that he had threatened to kill her on "a couple of occasions." Ms. Hudson also testified that she was uncooperative with the police at first because she was afraid Defendant Orrand would have her killed.

John Patterson testified that when he found Lynn's body, he saw a set of foot prints that were similar to the footprints his boots left. John was wearing Herman boots that day and was so worried about the footprints that he "stomped them to cover them up." However, John noticed that the footprints were bigger than his. John testified that at the time of the murder, Kevin also owned a pair of Herman boots. Chief Gammon testified that Kevin became a suspect because he became uncooperative with the investigators and because his alibi was called into question. According to Chief Gammon, the community services coordinator with the Sheriff's Department, Don Castleman, had seen Kevin either reentering or leaving the hospital the morning of the murder. Defendant Orrand's neighbor, Ms. Perry, testified that on the day of the murder, Defendant Orrand was adamant that Kevin not be interviewed by the police because he "had been through enough already" that day. Mr. Riley testified that after the murder, he saw either John or Kevin in a store and asked how Lynn was. According to Mr. Riley, he was "all giggle" and said, "He died. Hunting accident." Ms. Perry testified that after Lynn's death, Defendant Orrand would blame Lynn anytime something bad happened to her. Ms. Perry also testified that in 1982 or 1983, Defendant Orrand asked if she could leave her car with Ms. Perry while Defendant Orrand and Defendant Bush went on a vacation to Florida with their children. Ms. Perry asked Defendant Orrand if she was going to get married, and Defendant Orrand "laughed and said, no, that she would lose her [S]ocial [S]ecurity."

When the investigation was reopened in 2007, the police asked Mr. Riley to make a controlled phone call to Kevin. The phone call was recorded and monitored by the police. Mr. Riley told Kevin that the police were asking him questions about the murder. Kevin told Mr. Riley that he "didn't have nothing to do with the f-----g s--t." When Mr. Riley brought up the attack on Lynn in the garage, Kevin said that he did not "even know what you're

talking about now," that he did not "know nothing about nothing," and that would "be the last word I'll say when I die." Kevin testified that he denied everything to Mr. Riley because he assumed his phone was taped. A day after making the controlled call to Kevin, Mr. Riley received a telephone call at work. The caller did not identify himself, and Mr. Riley did not recognize the voice. The caller said that he knew Mr. Riley had an upcoming interview with the police and told him "the best thing to do is stay calm, stay cool" and "[d]on't tell them nothing." Mr. Riley informed Detective Tramel about the phone call and what the caller had said. Detective Tramel set up another controlled call, provided Mr. Riley with two phone numbers, and told Mr. Riley that they were for Defendant Bush's home and cell phones. Mr. Riley called the home number first and got no answer. Mr. Riley then called Defendant Bush's cell phone and spoke to a man. The phone call was recorded, and Mr. Riley testified that the recording played at trial was the phone call he made to the number Detective Tramel provided him.

At the beginning of the phone conversation, Mr. Riley asked for "Gary." Defendant Bush responded "Yeah." Mr. Riley told Defendant Bush that he was in his truck and calling him because the police just left his workplace after interviewing him. Defendant Bush told Mr. Riley that he did not "need to talk on that phone" because the police "can pick them up on a scanner." After reassuring Defendant Bush that the police were not close enough to monitor the call, Mr. Riley asked Defendant Bush "what do you want to do." Defendant Bush responded that he did not "want to do nothing" and that Mr. Riley needed to "[j]ust stay cool like I told you." Defendant Bush told Mr. Riley that the police were "gonna aggravate you for a while" and that Mr. Riley "better do" what he told him. Mr. Riley testified that he recognized Defendant Bush's voice as the voice of the earlier caller and that he "knowed right off the bat who it was." However, Mr. Riley testified that he "couldn't put a name to" the voice but that he could identify the voice as the same person who called him at work. After listening to a portion of the recording, Detective Tramel, Terry Orrand, and Ms. Rawls were all able to identify Defendant Bush's voice as the person speaking with Mr. Riley. Detective Tramel also testified that he was present during the recording of the phone conversation and that the voices belonged to Mr. Riley and Defendant Bush. A day after the controlled call, Mr. Riley got another phone call from Defendant Bush in which Defendant Bush asked how the police interview went and told Mr. Riley to "lose his phone number" and "don't say nothing to nobody."

Kristi Dunnan testified that she was Kevin's probation officer and that in the summer of 2007 Kevin was delinquent on his probation fees and fines. However, in August 2007 Kevin was able to pay off his fees in two separate payments totaling $1,052. Jeff Witas, the Defendants' neighbor, testified that in 2007, Defendant Bush asked him if he could get Kevin a job. Defendant Bush had the two meet in his garage because Mr. Witas wanted to meet Kevin to see what his qualifications were. Gary Orrand testified that Defendant Orrand

does not like to hear his son's middle name, Lynn. Gary also testified that Defendant Orrand told him she wanted to contest the exhumation of Lynn's body. However, she ultimately decided not to contest the exhumation. Terry Orrand testified that he spoke with his mother after he found out that she had hired an attorney to contest the exhumation. According to Terry, when he spoke with Defendant Orrand about the exhumation she "turned pale" and "looked more frightened than she did upset." Terry also testified that he had never seen Defendant Orrand cry over Lynn's death until the trial started. Terry admitted on cross-examination that he has sued Defendant Orrand for $5 million in a wrongful death action. Based upon the foregoing evidence, the jury convicted the Defendants of first-degree murder. They were sentenced to life imprisonment.

## ANALYSIS

### I. Disqualification of District Attorney General Whitesell and His Office

Defendant Orrand contends that the trial court erred by failing to disqualify District Attorney General William C. Whitesell, Jr. and his office from prosecuting this case. Defendant Orrand argues that General Whitesell's participation in the investigation into her claim for compensation from the CICF made him "a potential witness for the defense in this case," thereby disqualifying him from prosecuting this case. Defendant Orrand also argues that General Whitesell's participation at the hearing on the CICF claim and his signature on the order granting the claim made General Whitesell an "attorney ad hoc" creating an attorney-client relationship between the two and a conflict of interest for General Whitesell, or at the very least, an appearance of impropriety in his participation in the prosecution. The State responds that the trial court properly denied Defendant Orrand's motion because General Whitesell testified that he could not recall speaking to Defendant Orrand and that he signed the order "[b]ased on the information at that time." The State further responds that General Whitesell testified that he had no relevant, exculpatory testimony he could offer at trial and that General Whitesell never felt as if he had advocated on behalf of Defendant Orrand.

Defendant Orrand filed a claim for compensation from the CICF in the Rutherford County Circuit Court on January 14, 1983. A hearing was held on December 18, 1984, and no transcript of the hearing exists. The Circuit Court entered an order granting the claim in 1985. The Order listed several findings of fact which included the following: "(e) The Claimants did not contribute to the crime in any respect; (f) The identity of the offender in this case is unknown; [and] (g) Claimants have fully cooperated with the police and District Attorney General in the investigation of this crime . . . ." On the last page of the order, under the heading "Approved for Entry," are the signatures of Defendant Orrand's counsel, Jeff Henry, and then Assistant District Attorney General Whitesell.

Prior to trial, the Defendants filed a motion to disqualify District Attorney General William C. Whitesell, Jr. and his office from prosecuting this case. The Defendants' argument was based upon General Whitesell's involvement in Defendant Orrand's claim for compensation from the CICF. The Defendants contended that General Whitesell was a necessary exculpatory witness. The Defendants alternatively contended that General Whitesell's approval of the order made him an "attorney ad hoc" for Defendant Orrand, which created an attorney-client relationship between the two and made his prosecution of her a conflict of interest.

The trial court held a hearing on this matter on August 25, 2008. At the hearing General Whitesell testified that he was not actively involved in the investigation of Lynn's murder in 1982. General Whitesell admitted that "[i]n the general sense," he conducted an investigation regarding Defendant Orrand's claim but that he did not remember the hearing or what he may or may not have said to the Circuit Court. General Whitesell also testified that he did not remember ever speaking with Defendant Orrand about her claim. General Whitesell testified that "[b]ased on the information at that time," the District Attorney General's office had "no opposition to [Defendant Orrand's] claim." General Whitesell also repeatedly testified that he felt Defendant Orrand was represented by Mr. Henry in the compensation matter and that he did not feel like he was "advocating" for Defendant Orrand. General Whitesell testified that he had no relevant or exculpatory testimony to give in this case. The Defendants also presented the testimony of Detective Mark Dinardo, who said that he told a witness that "General Whitesell recovered" money from the CICF for Defendant Orrand. The Defendants contended that Detective Dinardo's statement was proof that General Whitesell was advocating on behalf of Defendant Orrand or at least showed that General Whitesell's participation in the CICF claim investigation created the appearance of impropriety. Following the hearing, the trial court entered a written order denying the Defendants' motion and concluding that General Whitesell had no exculpatory testimony regarding this case and had not been an "attorney ad hoc" for Defendant Orrand.

A trial court's ruling on the disqualification of a prosecutor or the entire office of the District Attorney General is reviewed under an abuse of discretion standard. State v. Culbreath, 30 S.W.3d 309, 313 (Tenn. 2000). In determining whether disqualification of a prosecutor is required, courts must ask the following three questions:

(1) Do the circumstances of the defendant's case establish an actual conflict of interest that requires the disqualification of a prosecutor? (2) Do the circumstances of the defendant's case create an appearance of impropriety that requires the disqualification of a prosecutor? (3) If either theory requires the disqualification of a prosecutor, is the entire District Attorney General's office likewise disqualified?

-16-

State v. Coulter, 67 S.W.3d 3, 29 (Tenn. Crim. App. 2001) (citing Culbreath, 30 S.W.3d at 312-13). When a defendant seeks to disqualify a prosecutor on the basis that the prosecutor is a potential witness a trial, the determination will depend "upon the value of their potential testimony." State v. Baker, 931 S.W.2d 232, 237 (Tenn. Crim. App. 1996).

The function of the office of the District Attorney General "is to prosecute criminal offenses in his or her circuit or district." Culbreath, 30 S.W.3d at 313; see also Tenn. Code Ann. § 8-7-103(1) (providing that each District Attorney General shall prosecute "all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto"). As part of this function, "the District Attorney General has the inherent duty under the law of Tennessee to investigate all infractions of the public peace and acts which are against the peace and dignity of the [s]tate." State v. Elrod, 721 S.W.2d 820, 822 (Tenn. Crim. App. 1986). Accordingly, a prosecutor's participation in the investigation of a case alone will not disqualify the prosecutor from subsequent participation in the prosecution of the case. See Id. at 822; State v. Randy Lee Ownby, No. M2007-01367-CCA-R3-CD, 2009 WL 112582, *9-10 (Tenn. Crim. App. Jan. 14, 2009). Additionally, as Defendant Orrand pointed out in her brief, the version of the Criminal Injuries Compensation Act in effect at the time of her claim mandated that the District Attorney General's offices investigate claims for compensation and report their findings to the court. See Tenn. Code Ann. § 29-13-109(a) (1983).

General Whitesell testified at the motion hearing that the findings of fact in the Circuit Court's order were "[b]ased on the information at that time" and that he had no relevant, exculpatory testimony to give regarding this case. General Whitesell also testified that he could not recall ever speaking to Defendant Orrand about her claim and that his memory regarding the investigation into the claim was vague at best. Defendant Orrand argues on appeal that despite General Whitesell's testimony to the contrary, his participation in the investigation of her claim affected her decision not to testify at trial because her "defense counsel had no reasonable way of learning exactly what [she] may or may not have told General Whitesell during" the investigation. However, Defendant Orrand's argument ignores the fact that she would have been present for any conversation she had with General Whitesell and that she would be privy to any information she provided General Whitesell. There is nothing in the record to suggest that the investigation into Defendant Orrand's CICF claim produced any exculpatory evidence that would have been admissible at trial. To require General Whitesell's disqualification based solely upon his participation in the investigation of this case would produce a profound chilling effect on one of the essential duties of the office of prosecutor. Accordingly, we conclude that the trial court did not abuse its discretion in denying Defendant Orrand's motion to disqualify General Whitesell based upon the fact that he was a potential witness at trial.

Defendant Orrand also contends that General Whitesell's participation at the hearing on the CICF claim and his signature on the order granting the claim created an attorney-client relationship between the two or an appearance of impropriety. Defendant Orrand has cited no authority regarding her theory that General Whitesell was serving as an "attorney ad hoc" on her behalf. Furthermore, Defendant Orrand was represented by her own private counsel, Jeff Henry, who drafted and filed the claim, represented her at the hearing on the matter, and signed the order on her behalf. As discussed above, General Whitesell had a statutory duty to investigate Defendant Orrand's claims and to present his findings to the Circuit Court. General Whitesell in no way represented Defendant Orrand in her CICF claim. As the trial court stated, General Whitesell merely made "a stipulation resulting in the advancement of an adverse party's interests." Taken to its logical conclusion, Defendant Orrand's argument would mean that an attorney-client relationship would be created any time a prosecutor agreed to a plea bargain or signed an order dismissing an indictment against a defendant. For this court to agree with Defendant Orrand's argument, we would have to stretch the definition of an attorney-client relationship beyond recognition. Accordingly, we conclude that this issue is without merit.

## II. *Admission of Recorded Phone Conversation Between Defendant Bush and Jason Riley*

Defendant Bush contends that the trial court erred by admitting into evidence a tape recording of a phone conversation between Defendant Bush and Jason Riley. Defendant Bush argues that the State did not provide any "records from the phone company to show that the number" called belonged to Defendant Bush. Defendant Bush further argues that Mr. Riley "was unable to identify" the other voice on the recording "with certainty until after the detectives told him who the speaker on the other end of the line was;" therefore, he could not authenticate the phone call or that it was Defendant Bush's voice on the recording. Defendant Bush also contends that the trial court erred by allowing the jury to view a transcript of the recording entitled "Phone call between Gary and Jason" and which labeled the the participants as "Gary" and "Jason." Defendant Bush argues that the transcript was "unreasonably suggestive as to the identity of the participants in the conversation." The State responds that the trial court acted within its discretion in admitting the tape recording into evidence. The State argues that Mr. Riley properly authenticated the recording.

Trial courts are given broad discretion in ruling upon the admissibility of evidence and such rulings will not be overturned absent an abuse of that discretion. State v. Dellinger, 79 S.W.3d 458, 487 (Tenn. 2002). We begin by noting that the admissibility of the phone conversation at issue involves two separate but related issues: the authentication of Defendant Bush's voice and the authentication of the tape recording. Authentication of a voice may be made by "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice

at any time under circumstances connecting it with the alleged speaker." Tenn. R. Evid. 901(b)(5). This court has previously ruled that "[f]or authentication purposes, voice identification by a witness need not be certain; it is sufficient if the witness thinks he can identify the voice and express his opinion." Stroup v. State, 552 S.W.2d 418, 420 (Tenn. Crim. App. 1977). Regarding the authentication of a tape recording, our supreme court has held that

> tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with other rules of evidence.

State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980), superseded by statute on other grounds as stated in State v. Shropshire, 874 S.W.2d 634, 638 (Tenn. Crim. App. 1993).

At trial, Mr. Riley testified that he was present during the conversation and that the tape was an accurate reproduction of the telephone conversation. Mr. Riley further testified that he recognized the voice as the same person who had called him earlier and told him to "stay cool." Mr. Riley also testified that he had been given Defendant Bush's cell phone number by the police, that he asked for Gary, that the other person responded "Yeah," and that he believed the voice belonged to Defendant Bush. Defendant Bush's argument that Mr. Riley cannot authenticate the tape recording because he was "unable to identify" Defendant Bush's voice at the time of the conversation is misplaced. Under Tennessee law, a witness need only have "adequate familiarity" with the speaker's voice at the time testimony is given in order to opine as to the identity of the speaker and familiarity "can be gained in a relatively short period of time, and as the result of conversations occurring before or after the conversation that was identified." NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE, § 9.01[7], at 9-11 (5th ed. 2005). In addition to Mr. Riley's testimony, Detective Tramel testified that he was present with Mr. Riley during the conversation and that he monitored the conversation. Detective Tramel also identified the voices on the tape recording as belonging to Mr. Riley and Defendant Bush. In addition to the testimony of Detective Tramel and Mr. Riley, two other witnesses, Terry Orrand and Christy Rawls, identified Defendant Bush as the person speaking with Mr. Riley. Accordingly, we conclude that the voice and the tape recording were properly authenticated and that the trial court did not abuse its discretion in admitting the recording into evidence.

At the hearing on the motion for new trial, counsel for Defendant Orrand addressed the court regarding this issue and stated, "First of all, let me apologize to the [trial court] because we objected strenuously . . . [a]nd our subsequent research tells us quite frankly I

believe the [trial court] was right." Defendant Orrand's counsel said that he believed the recording was properly authenticated but that he was not withdrawing his objection, he just "believe[d] the [trial court] was correct in its ruling." Counsel for Defendant Bush later acquiesced to Defendant Orrand's counsel's statements by saying "I have no idea what I'm doing here since [Defendant Orrand's counsel] has eloquently covered everything that was in our motion." We are troubled that Defendant Bush's counsel would raise this issue on appeal and argue that Mr. Riley's authentication of the tape recording was suspect when the recording was also authenticated by Detective Tramel, two other witnesses identified Defendant Bush's voice on the tape, and counsel had acquiesced to the statements of defense counsel for Defendant Orrand that the trial court had properly admitted the tape into evidence.

Regarding the transcript, "[i]t is well-settled in Tennessee that a transcript of a tape may be given to a jury where the jury is instructed that the tape, and not the transcript is the actual evidence." State v. Barnard, 899 S.W.2d 617, 623-24 (Tenn. Crim. App. 1994). Here, the transcript was not entered into evidence and merely served as a listening aid for the jury. Importantly, the trial court instructed the jury that the tape, not the transcript, was the evidence; that the transcript was "only an aid for you;" and that where the transcript listed names, "that doesn't necessarily mean that's who that is." Similar use of transcripts with the purported speakers names in the margins have been upheld by other jurisdictions. See United States v. Keck, 773 F.2d 759, 766 (7th Cir. 1985); Grimes v. State, 633 N.E.2d 262, 264 (Ind. Ct. App. 1994). Additionally, at the beginning of the conversation, Mr. Riley asked for Gary and the speaker identified himself as Gary by responding "Yeah." Accordingly, we conclude that this issue has no merit.

### III. Sufficiency of the Evidence

Both Defendants contend that the evidence was insufficient to sustain their convictions because it was based upon the uncorroborated testimony of an accomplice, Kevin Patterson. Defendant Orrand contends that absent the testimony of Ms. Hudson, there was no evidence corroborating Kevin's testimony. Defendant Orrand argues that Ms. Hudson's testimony must be ignored because she was also an accomplice to the murder. Defendant Orrand joins Defendant Bush in his argument that "there was no corroboration of the testimony of accomplice Kevin Patterson at trial." Both Defendants argue that the State, through the remainder of its witnesses and evidence, only presented evidence regarding "the nature of the relationship between" the Defendants and that any evidence regarding the Defendants' motive for the crime "does not corroborate" Kevin's testimony. The State responds that multiple witnesses and pieces of evidence corroborated Kevin's testimony and that Kevin's testimony coupled with the corroborative evidence was sufficient to sustain the Defendants' convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The Defendants do not contend that the State failed to produce sufficient evidence to fulfill all of the elements of the offense of first degree murder; instead, they contend that their convictions are based upon the uncorroborated testimony of an accomplice. It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). An accomplice is one "who knowingly, voluntarily and with common intent unites with the principal offender[s] in the commission of the crime." State v. Ballinger, 93 S.W.3d 881, 887 (Tenn. Crim. App. 2001). When "a witness denies involvement in the crime, the question of whether he or she is an accomplice is one of fact to be submitted to the jury with proper instructions from the court on how to consider such testimony." Id. at 887-88. The only witness listed as an accomplice in the jury instructions was Kevin Patterson. By failing to request a proper jury instruction, the Defendants have waived the issue of whether any other witnesses, including Ms. Hudson, were also accomplices. See State v. Anderson, 985 S.W.2d 9, 18 (Tenn. Crim. App. 1997).

Our supreme court has described what is required to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be

-21-

direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). The corroborative evidence need not be "overwhelming." Id. In fact, "[o]nly slight circumstances are required to corroborate an accomplice's testimony." State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). However, "the corroboration must include some fact establishing the identity of the defendant as a criminal actor." State v. Boxley, 76 S.W.3d 381, 387 (Tenn. Crim. App. 2001) (citing Shaw, 37 S.W.3d at 903). Whether there is sufficient corroboration is a determination for the jury. Shaw, 37 S.W.3d at 903. Upon review, an appellate court should "consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense." Smith v. State, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

Despite the Defendants' contentions, evidence of motive may be used to corroborate an accomplice's testimony and establish the defendant's identity if it is considered in connection with other evidence tending to connect the defendant to the crime. See State v. Gaylor, 862 S.W.2d 546, 552-53 (Tenn. Crim. App. 1992) (Wade, J.); see also Smith, 332 S.W.3d at 442-447 (concluding that evidence of motive along with evidence of opportunity, evidence of the defendant's behavior before and after the murders, and evidence that "strongly indicated" the defendant had disposed of the murder weapon was sufficient to corroborate the accomplice's testimony). This is especially true for "crimes for hire" cases, which create a unique analytical challenge to the corroboration rule. As one neighboring jurisdiction has noted, "The nature of a 'crime for hire' is that a physical connection between the defendant and the crime, or even the scene of the crime, may never exist. The defendant hires an accomplice for the purpose, among others, of avoiding a physical connection or presence." Ex parte Bullock, 770 So. 2d 1062, 1068 (Ala. 2000). Put another way, a well executed "crime for hire" plot, by its very nature, would leave no evidence to corroborate an accomplice's testimony. Therefore, "the corroboration of an accomplice's testimony in cases of 'crimes for hire' may consist primarily of the defendant's statements, which, interpreted by reference to the circumstances, tend to connect the defendant to the crime." Id.

The State produced sufficient corroborative evidence at trial. With respect to the identity of Defendant Orrand and her involvement in Lynn's murder, the state produced significant evidence establishing her motive as well as other corroborative evidence. Kevin testified that Defendant Orrand told him that she would not divorce Lynn because he "would not leave her alone." Prior to Lynn's death, Defendant Orrand told one of her coworkers that

Lynn was abusive, that she could not divorce him because he would take her children, and that he "would not leave her alone." Similarly, Mr. Riley testified that he was told that the Defendants wanted Lynn killed because he was abusive and because they wanted to marry. The State also presented evidence that shortly before Lynn's death, he increased the amount of his life insurance policy with Defendant Orrand as the sole beneficiary of the policy. Defendant Orrand told Lynn and his brother that "if something was to happen to you, if I would have you killed, I'd be a rich woman." Kevin testified that while he was living with Ms. Hudson's parents, he had several phone conversations with Defendant Orrand regarding the murder. Ms. Hudson testified that Defendant Orrand would frequently call her parents' home to speak with Kevin. Additionally, Defendant Orrand's mother testified that the only people who knew Lynn would be hunting on the morning of the murder were herself, Defendant Orrand, and Kevin.

When first told by her mother that Lynn had been shot, Defendant Orrand said, "If you had called the ambulance he might not would have died." However, Defendant Orrand should not have known at that time that several hours had passed between the time Lynn was shot and when his body was found. At the funeral home, Defendant Orrand stated several times that she wanted Lynn "back now." There was also evidence that Defendant Orrand was not troubled by the fact that Lynn's murder remained unsolved for decades. Kevin testified that he agreed to kill Lynn in exchange for $5,000 and that Defendant Orrand allowed Kevin and his family to move in with her. Several witness testified that shortly after Lynn's murder, Kevin and his family moved in with Defendant Orrand for a few months until Defendant Orrand "kicked them out." The State also produced evidence that after the investigation was reopened, Kevin's delinquent probation fines and fees were paid off in two payments. Kevin testified that each of the Defendants gave him money to pay off his probation fines and fees. Additionally, Defendant Bush tried to get a job for Kevin in 2007, including having a meeting in his garage with Kevin and his neighbor. The neighbor testified that Defendant Orrand walked in and out of this meeting in the garage.

With regard to the identity of Defendant Bush and his involvement in Lynn's murder, Mr. Riley testified that Kevin and a man, who was driving a black Ford pickup truck and introduced as Kevin's "sister's boyfriend," asked him to kill Lynn. Mr. Riley testified that he came to an agreement with Kevin and "his sister's boyfriend" to attack Lynn in his garage for $5,000. Mr. Riley testified in detail about the attack, including that he used a "tire tool," that he was wearing a jacket with fur around the hood, and that he ran away after Lynn either "pulled a gun or said he had a gun." Details of Mr. Riley's description of the attack were corroborated by the testimony of Gary Orrand and Officer Kety. The State also introduced a recorded phone conversation between Mr. Riley and Defendant Bush in which Defendant Bush told Mr. Riley to "stay cool" about the investigation into the murder. Kevin's testimony that he received the murder weapon from Defendant Bush was corroborated by

Ms. Hudson, who testified that she went with Kevin to Jackson Heights where he met with a man in a black Ford pickup truck. According to Ms. Hudson, Kevin then placed something that looked like a gun wrapped in a piece of cloth into the trunk of the car, and, as they were leaving, Ms. Hudson saw the man in the black Ford pickup truck and identified him as Defendant Bush. Ms. Hudson testified that she later saw Defendant Bush in the same truck. Defendant Bush's ex-wife testified that in 1981 and 1982 he owned a black Ford pickup truck, and a shotgun.

In addition to the preceding evidence regarding the Defendants' identities, the State also produced a significant amount of evidence regarding the Defendants' motive for Lynn's murder. Several former coworkers testified that it was common knowledge at Gemtop that the Defendants were having an affair. Defendant Bush's ex-wife testified that she suspected that he was having an affair with Defendant Orrand. Several other witnesses testified that they saw the Defendants engaged in a romantic relationship shortly after Lynn's death. Additionally, at the time of Lynn's death, he and Defendant Orrand had five dollars in their joint checking account and owned no real property. The State proved that Defendant Orrand collected significant sums of money from Lynn's life insurance policy, the CICF, and Social Security benefits. In fact, Lynn told Ms. Perry in 1982 or 1983 that she would not marry Defendant Bush because she would lose her Social Security benefits. After collecting this money, Defendant Orrand purchased a house that Defendant Bush eventually moved into.

The State also produced crime scene and forensic evidence to corroborate Kevin's testimony. The footprints found in the snow followed the same path Kevin testified that he took to the site of the murder. The footprints also corroborated Kevin's testimony that he ran from the murder scene back to the abandoned church and that he fell and dropped the shotgun in the snow. Kevin's brother John testified that the footprints look similar to those made by his Herman boots and that Kevin owned a pair of those boots. Tire tracks were found at the abandoned church where Kevin testified that he had parked the station wagon. Forensic evidence showed that Lynn was shot with the same type of gun and the same type of slugs as Kevin testified to having used. Kevin testified that he fired two shots at Lynn, with the first shot missing Lynn. The forensic evidence showed that two shots were fired and one missed Lynn and hit a nearby rock, sending debris into Lynn's arm. Kevin also testified that he went to his wife's hospital room after the murder to establish an alibi. Chief Gammon testified that Kevin was seen either reentering or leaving the hospital on the morning of the murder. Ms. Hudson testified that Kevin came into her hospital room that morning, confessed to killing Lynn, and described parking the station wagon at the abandoned church and walking in the woods to the murder scene.

As stated above, this court must consider the combined force of all of the corroborative evidence, including evidence of motive. Tennessee law does not require the

State to have corroborated every aspect of Kevin's testimony nor does it require that the corroborating evidence alone had to be sufficient to prove the Defendants' guilt beyond a reasonable doubt. Instead, the corroborative evidence in and of itself need not be sufficient to sustain a conviction, and only a portion of the accomplice's evidence, including the identity of the defendant, must be corroborated. Accordingly, we conclude that there was sufficient evidence to corroborate the accomplice's testimony and sustain the Defendants' convictions.

## IV. Alternate Juror Selection

Defendant Bush contends that the trial court erred by failing to select the alternate jurors "in plain view." Defendant Bush argues that because the original lot of jurors were drawn publicly, the alternates were required to be drawn publicly as well. Defendant Bush further argues that the trial court's failure to draw the alternates publicly created the impression that they were pre-selected. Defendant Bush also contends that he was prejudiced by the trial court's failure to publicly draw the alternates because one of the alternate jurors "had been taking copious notes." The State responds that Defendant Bush has failed to cite any legal authority for his contentions. The State also responds that nothing in the Rules of Criminal Procedure requires that the selection be done "in plain view" and that even if the trial court had erred, Defendant Bush has failed to demonstrate any resulting prejudice.

Following the close of proof and after the jury had begun its deliberations, Defendant Bush's counsel asked the trial court, "[o]ut of curiosity how were the alternates selected?" The trial court responded that they were selected randomly pursuant to the Rules of Criminal Procedure. Defense counsel stated that he was "familiar with the rules" but that he "just didn't see it done." The trial court responded that "I did it over here. I have 14 names and I pulled two names out." Defendant Bush's counsel responded "Fine. I wasn't looking." At the hearing on the motion for new trial, the trial court stated that "Just for the record I drew [the alternates] out during your closing argument just while I was sitting here. I didn't do it publicly. I'll admit that."

The rules "prescribing jury selection procedures are intended to protect the integrity of the jury system by providing a uniform and ordered method that ensures the accused a fair and impartial jury chosen from a fair cross-section of the community." State v. Coleman, 865 S.W.2d 455, 458 (Tenn. 1993). When a defendant alleges error in the jury selection process, "[i]t is the burden of the defendant to prove prejudice or purposeful discrimination in the selection of a jury. Prejudice will not be presumed." Id. Tennessee Rule of Criminal Procedure 24(f) provides for two methods of selecting alternate jurors. The method used by the trial court is referred to as the single entity method, which provides,

-25-

During jury selection and trial of the case, the court shall make no distinction as to which jurors are additional jurors and which jurors are regular jurors. Before the jury retires to consider its verdict, the court shall select by lot the names of the requisite number of jurors to reduce the jury to a body of twelve . . . . A juror who is not selected to be a member of the deliberating jury shall be discharged when that jury retires to consider its verdict.

Tenn. R. Crim. P. 24(f)((2)(A). The Advisory Commission Comments note that "before the jury retires to deliberate the court will randomly deselect the additional jurors."

The State is correct in its assertion that Rule 24 does not require the trial court to publicly draw the names of the alternate jurors when using the single entity method. While the better practice may very well be to publicly draw the alternate jurors' names, there is simply nothing in the text of Rule 24(f) or the Advisory Commission Comments to suggest that the trial court is required to draw the names "in plain view." Furthermore, Defendant Bush has presented no evidence to suggest he was prejudiced by the selection of the alternate jurors. There was no suggestions that either of the alternate jurors would have favored Defendant Bush. While one of the alternates had taken extensive notes, both the State and the Defendants were equally subject to the affects of that juror's removal. Accordingly, we conclude that this issue has no merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE